## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| CONSERVATION LAW FOUNDATION<br>62 Summer Street<br>Boston, MA  02110-1016<br><br>Plaintiff,<br><br>v.<br><br>WILBUR ROSS, in his official capacity as<br>Secretary of the United States Department of Commerce<br>Office of the Secretary<br>Room 5851<br>14th Street and Constitution Avenue, N.W.<br>Washington, D.C.  20230<br><br>CHRIS OLIVER, in his official capacity as<br>Assistant Administrator of<br>NOAA Fisheries<br>1315 East-West Highway<br>Silver Spring, MD  20910<br><br>NATIONAL MARINE FISHERIES SERVICE<br>United States Department of Commerce<br>1315 East-West Highway<br>Silver Spring, MD  20910<br><br>Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Civil Action<br><br>No. _____ |

_____)


## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

1.      This case challenges the National Marine Fisheries Service's ("NMFS" or

"Defendant") partial approval of New England's Omnibus Essential Fish Habitat Amendment

("Amendment").  The New England Fishery Management Council ("Council") and NMFS took

14 years to develop the Amendment and set out to achieve worthy goals, including minimizing

the impacts of fishing gears on essential fish habitats where practicable and improved protections for spawning fish and juvenile groundfish habitat necessary to restore New England's severely depleted Atlantic cod and other groundfish populations.

2.      In the region, the final Amendment reduced the amount of currently protected essential fish habitat by over 40 percent[1] and lifted current restrictions on destructive fishing practices in vital parts of the remaining "protected" habitat, including areas that are critical habitat for endangered North Atlantic right whales.  Through these management changes, the Amendment opens more than 3,000 square miles of previously-protected Northwest Atlantic Ocean to commercial fishing gears that are known to be destructive of essential fish habitats.

3.      NMFS published its final rule implementing the Amendment on April 9, 2018. Final Rule, 83 Fed. Reg. 15420 (Apr. 9, 2018) (NMFS's immediately-effective implementing regulations).   This suit seeks to compel compliance with the Magnuson-Stevens Fisheries Conservation and Management Act ("Magnuson-Stevens Act" or "MSA"), the National Environmental Policy Act ("NEPA"), and the Administrative Procedure Act ("APA").

4.      Conservation Law Foundation ("CLF") on its own behalf and on behalf of its adversely affected members challenges Defendants' partial approval of the Omnibus Essential Fish Habitat Amendment 2 ("Amendment") prepared by the New England Fisheries Management Council ("Council" or "NEFMC"). *See* Record of Decision (NMFS partial approval), attached as Exhibit 1.

5.      Although protections throughout the region are inadequate, CLF here challenges the habitat management actions and habitat management alternatives concerning EFH protection and conservation in the Gulf of Maine – specifically, NMFS's approvals for the Eastern,

Western, and Central Gulf of Maine sub-regions - which are severable from the remainder of the Amendment.

6.      CLF alleges that Defendants Ross, Assistant Administrator Oliver, and the National Marine Fisheries Service (collectively "NMFS") have acted arbitrarily, capriciously and contrary to law in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, by erroneously approving parts of the Amendment that do not comply with the essential fish habitat protection requirements of the Magnuson-Stevens Act Fisheries Conservation and Management Act ("MSA" or "Magnuson-Stevens Act"), 16 U.S.C. §§ 1801-1891d; or with the environmental review procedural requirement of the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370f.

7.      CLF seeks declaratory and injunctive relief.

## APPLICABLE STATUTES, JURISDICTION, AND VENUE

8.      This action arises under the MSA, 16 U.S.C. §§1801-1883; the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370f; and the Administrative Procedure Act ("APA"), 5 U.S.C. §§701-706.

9.       This Court has jurisdiction over this action pursuant to the MSA, which provides that "the district courts of the United States shall have exclusive jurisdiction over any case or controversy arising under" the MSA. 16 U.S.C. §1861(d).

10.      Defendants published the final rule implementing the Amendment on April 9, 2018 in the federal register.

---

[1] The amount of EFH ultimately protected by the terms of AMENDMENT may well reach less than 50 percent of areas that were closed before AMENDMENT if certain exemptions provided for in the Amendment are implemented

11.     CLF files this complaint within 30 days of the publication of the final rule in accord with filing rules provided in Rule 6(a) of the Federal rules of Civil Procedure, and the rules regarding judicial review under the MSA, 16 U.S.C. § 1855(f)

12.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e), 16 U.S.C. § 1540(g)(3)(A), and 5 U.S.C. § 703, because Defendants reside or have their official headquarters in this judicial district and a substantial part of the events or omissions giving rise to the claims occurred in this district.

13.     This Court may issue a declaratory judgment in this case pursuant to 28 U.S.C. §§2201-2202, and may grant relief pursuant to the MSA, 16 U.S.C. §§1861(d) and 1855(f), as well as the APA, 5 U.S.C. §706.

## THE PARTIES

14.     Founded in 1966, CLF is a non-profit, member-supported environmental organization with offices in Massachusetts, Maine, New Hampshire, Vermont, and Rhode Island. CLF's advocates use the law, science, and economics to solve the problems threatening New England's natural resources and communities.  For decades, CLF has worked in its own right and on behalf of its members to promote marine conservation and stewardship, sound management of the region's marine fisheries, and revitalization of New England's once-legendary ocean resources.

15.     Fundamental to its corporate purposes, CLF undertakes litigation and other legal advocacy in its organizational capacity and as a representative of its members' interests. CLF, both as an organization and in its representative capacity of its adversely affected members, has been plaintiff in numerous administrative law challenges to MSA decisions, reaching as far back as 1991. *See Conservation Law Foundation of New England v. Mosbacher,* 966 F.2d 39 (1st Cir.

1991).

16.     CLF's standing to challenge alleged violations of the MSA, NEPA, and the APA

has been recognized in at least six previous actions related to MSA compliance in federal courts

in the District of Columbia Circuit and in the First Circuit. The important role that environmental

organizations play in achieving the purposes of the MSA is explicitly recognized by Congress in

the MSA. *See* 16 U.S.C. §1801(b)(5).

17.     In addition to the adverse impacts that Defendants' actions here have on CLF's

organizational interests in achieving sound management of federal fisheries resources in New

England, CLF brings this matter on behalf of its adversely affected members.

18.     CLF's members consume local commercially-caught and recreationally-caught

New England groundfish and other Council-managed fish species that require the essential fish

habitats identified for protection by the MSA and by the Amendment. They use and enjoy fish

populations and marine wildlife that is dependent on those fish species located off the New

England coast for recreational, educational, and scientific purposes. CLF's members also

conduct research on the biota and habitats that Congress has directed Defendants to protect from

the adverse impacts of fishing gears if practicable.

19.     By failing to minimize the adverse impacts of fishing gears on these essential fish

habitats in New England where practical, Defendants are reducing the productivity of the marine

ecosystem associated with those habitats and reducing the populations of fish and other marine

life as well as the health of the ocean that members of CLF rely on and benefit from for food

consumption, fishing, and research.

20.     Unless the harms suffered by CLF and its members are redressed in this action,

CLF's interests and those of its members will continue to be adversely affected and irreparably

injured by defendants' unlawful failure to perform their non-discretionary duties under the MSA,

NEPA, and the APA.

21.     Federal defendant Wilbur Ross is Secretary of the United States Department of

Commerce.  He is sued in his official capacity as the chief officer of the Department charged

with overseeing the administration and implementation of the Magnuson-Stevens Act and

NEPA.

22.     Federal defendant Chris Oliver is sued in his official capacity as Assistant

Administrator of the National Marine Fisheries Service ("NMFS") of the National Oceanic and

Atmospheric Administration ("NOAA"). Secretary Ross has delegated responsibility to ensure

compliance with the MSA and NEPA to NOAA, which in turn has sub-delegated that

responsibility to NMFS.

23.     Federal defendant NMFS is an agency of the United States Department of

Commerce that has been delegated the responsibility to review fishery management plans and

Amendments to those plans and to issue implementing regulations.  NMFS is the United States

government agency with primary responsibility to ensure that the requirements of the MSA,

NEPA and APA are followed and enforced with respect to matters within their jurisdiction.

## STATUTORY AND REGULATORY BACKGROUND

### A.  THE MAGNUSON-STEVENS ACT

24.     The MSA is designed to conserve and manage fish populations in the territorial

waters of the United States and in the exclusive economic zone, which extends from the

boundaries of state waters (three miles from shore) to 200 miles offshore or to an international

boundary with neighboring countries. 16 U.S.C. § 1801(b)(1).

25.     The MSA vests primary management responsibility for management with the

Secretary of Commerce, who in turn has sub-delegated this responsibility to NMFS.

26.     The MSA creates eight regional fishery management councils and mandates that each council shall prepare a fish management plan "for each fishery under its authority that requires conservation and management." 16 U.S.C. § 1852(h)(1).

27.     All fishery management plans and regulations implementing those plans are subject to final review and approval by NMFS to ensure that they comply with the requirements of the MSA, as well as other applicable laws and requirements. 16 U.S.C. § 1854(a) & (b).

28.     NMFS's ability to modify plans or Amendments recommended by the regional fish management councils is restricted by the requirement to approve, disapprove, or partially approve a recommended plan or Amendment based on its consistency with the MSA and other applicable laws, including the ESA. 16 U.S.C. § 1854(a)(3)

29.     The MSA defines EFH as "those waters and substrate necessary to fish for spawning, breeding, feeding or growth to maturity." 16 U.S.C. § 1802(10).

30.     The MSA require all fishery management councils to amend the fishery management plans ("FMP") within their jurisdiction to ensure the "conservation and enhancement" of EFH. 16 U.S.C. § 1855(b)(1)(A).

31.     Under the MSA, NMFS is required to ensure that approved FMPs "describe and identify essential fish habitat for [each] the fishery…." 16 U.S.C. § 1853 (a)(7).

32.     NMFS is also required to ensure that approved FMPs "minimize to the extent practicable adverse effects on such habitat caused by fishing" and "identify other actions to encourage the conservation and enhancement of such habitat." 16 U.S.C. § 1853 (a)(7).

33.     Councils must act to prevent, mitigate, or minimize any adverse effects from fishing, to the extent practicable, if there is evidence that a fishing activity adversely affects EFH

in a manner that is more than minimal and not temporary in nature." 50 C.F.R. §

600.815(a)(2)(ii).

34.     The MSA also provides that actions taken by the NMFS under regulations

implementing a fishery management plan shall be subject to judicial review "if a petition for

such review is filed within 30 days after the date on which the regulations are promulgated or the

action is published in the Federal Register, as applicable." 16 U.S.C. § 1855(f).

**B. THE NATIONAL ENVIRONMENTAL POLICY ACT**

35.     Congress enacted the National Environmental Policy Act ("NEPA") to "promote

efforts which will prevent or eliminate damages to the environment . . . ." 42 U.S.C. § 4321.  To

achieve this goal, NEPA requires federal agencies to fully consider and disclose the

environmental consequences of an agency action before proceeding with that action. *See id*. §

4332(2)(C); 40 C.F.R. §§ 1501.2, 1502.5.

36.     The cornerstone of NEPA is the environmental impact statement ("EIS"). An EIS

is required for all "major Federal actions significantly affecting the quality of the human

environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.4.  It must provide a "full and fair

discussion of significant environmental impacts and . . . inform decision makers and the public of

the reasonable alternatives which would avoid or minimize adverse impacts or enhance the

quality of the human environment." 40 C.F.R. § 1502.1.

37.     In an EIS, the federal agency must identify the direct, indirect, and cumulative

impacts of the proposed action and consider alternative actions and their impacts.  *See* 42 U.S.C.

§ 4332(C).

38.     The agency is required to prepare a "Record of Decision" memorializing its

decision. 40 C.F.R. § 1505.2. The Record of Decision ("ROD"), *inter alia,* must "identify all

alternatives considered by the agency in reaching its decisions, specifying the alternative or alternatives that were considered to be environmentally preferable." *Id.*  The ROD must also "state whether all practicable means to avoid or minimize environmental harm from the alternative selected have been adopted, and if not, why they were not."  *Id.*

39.    NEPA does not provide an independent basis for judicial review, which is brought pursuant to the APA.

**C.  THE ADMINISTRATIVE PROCEDURE ACT**

40.    The APA grants a right of judicial review to "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action…." 5 U.S.C. § 702.

41.    Under the APA, a court must "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law…." *Id*. § 706(2)(A).  An agency action is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n. v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

42.    Under the APA, a court must also "hold unlawful and set aside" any agency action taken that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

43.    NMFS's issuance of its final rule implementing measures in the Omnibus Habitat Amendment is "agency action" subject to judicial review under the APA.

## FACTUAL ALLEGATIONS

44.     The Amendment process was initiated as a result of a judicial decision in

*American Oceans Campaign v. Daly,* 183 F. Supp. 2d 1 (2000), that rejected NMFS's reliance on

a NEPA environmental assessment ("EA") prepared in connection with the NEFMC's Omnibus

EFH Amendment in 1998. *Id.,* 183 F. Supp. 2d at 6-7. The basis for the court's decision was that

the EA prepared for the NEFMC's Omnibus EFH Amendment "fail[ed] to consider all relevant

and feasible alternatives, and fail[ed] to fully explain the environmental impact of the proposed

action and alternatives." *Id.,* 183 F. Supp. 2d at 20.

45.     In 2004, following that decision, the Council initiated the Amendment process.

The task was divided into two phases: (1) identification of EFH for all species and life states

under management by the Council; and (2) identification of actions necessary to minimize the

impacts of fishing gears on that identified EFH to the extent practicable.

46.     In 2011, the Council voted to revise the system of existing closed areas that

restricted some types of fishing gear, as part of the Amendment, and developed alternatives for

each of the sub-regions identified: Eastern Gulf of Maine, Central Gulf of Maine, Western Gulf

of Maine, Great South Channel and Southern New England, and Georges Bank.[2]

47.     The Council completed the Amendment in June of 2015 and submitted the

package to NMFS for review in the fall of 2015.

48.     NMFS published a Notice of Availability of Amendment in October 2017 and

published the final Amendment EIS in October 2017.  Issuance of the Record Of Decision for

the Amendment's EIS was issued by Defendant Oliver on January 3, 2018 and the final NMFS

---

[2] Prior to implementing the Omnibus Habitat Amendment, approximately 6,711nm2 (7,717 square miles) of ocean were closed year-round to mobile bottom-tending gear.

regulations implementing Amendment were published on April 9, 2018. 83 Fed. Reg. 15240 (Apr. 9, 2018).

49.     The ROD relied on a separate Decision Document. *See* Exhibit 1 (Record of Decision) at 24. The Decision Document is attached here as Exhibit 2.

50.     Although the purpose of the Amendment FMP was to *minimize* the impacts of fishing gears on EFH where practicable across the region, the Amendment actually *opens* over 40-percent of the existing areas in New England that were closed to mobile fishing gears for the purposes of rebuilding depleted fish stocks prior to the Amendment.

51.     CLF, on its own and on behalf of its members, participated actively during this drawn-out 14-year EFH process, both in the Council process as well as NMFS's FMP and NEPA review process. CLF attended numerous Council meetings and technical workshops; CLF provided extensive written and oral policy, factual and technical comments; and CLF engaged throughout the process in educating its members and the public on CLF's view of the Amendment process and substantive recommendations.

52.     NMFS's Record of Decision describing the approved measures in the Habitat Amendment constitutes final agency action for purposes of NEPA review under the APA. NMFS's partial approval of the Amendment FMP and EIS as codified in the regulations promulgated by NMFS implementing those approvals is judicially reviewable pursuant to the MSA and APA. 16 U.S.C. § 1855(f).

53.     CLF does not seek to invalidate NMFS's partial approval of the Amendment in its entirety by this request for judicial review. As noted in the ROD, the Council and NMFS approached the EFH analysis and management action review using five discrete sub-regions: the Eastern Gulf of Maine, the Central Gulf of Maine, the Western Gulf of Maine, Georges Bank,

and Great South Channel and Southern New England. *See* Exhibit 1 (Record of Decision), at 12. CLF does not challenge the EFH designations here nor does it challenge the areas identified by the Council and NMFS as "habitat areas of particular concern" ("HAPC"). Further, CLF does not challenge the NMFS actions taken with respect to EFH protection in the Georges Bank sub-region or in the Great South Channel/Southern New England sub-region.

54.     CLF here challenges the habitat management actions and habitat management alternatives concerning EFH protection and conservation in the Eastern Gulf of Maine, Central Gulf of Maine, and Western Gulf of Maine. The decisions in these sub-regions are severable from the remainder of the Amendment decision.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**DESPITE PRACTICABLE ALTERNATIVES THAT WOULD INCREASE THE AMOUNT OF EFH PROTECTED, THE AMENDMENT REDUCES THE AMOUNT OF EFH PROTECTED IN VIOLATION OF THE MSA'S MANDATE TO PROTECT ESSENTIAL FISH HABITAT TO THE EXTENT PRACTICABLE**

55.     Paragraphs 1 through 54 are hereby re-alleged as though set out in full.

56.     Under the MSA, NMFS is required to ensure that all FMPs "minimize to the extent practicable adverse effects on such [EFH] habitat caused by fishing" and "identify other actions to encourage the conservation and enhancement of such [EFH] habitat." 16 U.S.C. § 1853 (a)(7).

57.     All fishery management plans and plan amendments must further comply with the MSA's requirement that all fishery management measures be based on the best available science. 16 U.S.C. § 1851(a)(2).

58.     As part of implementing the MSA's provisions, regulations provide that FMPs should identify a range of potential new actions that could be taken to address adverse effects of

fishing on EFH, and "include an analysis of the practicability of potential new actions, and adopt any new measures that are necessary and practicable." 50 CFR § 600.815 (a)(2)(ii).

59.     Regulations also provide that "in determining whether it is practicable to minimize an adverse effect from fishing, Councils should consider the nature and extent of the adverse effect on EFH and the long and short-term costs and benefits of potential management measures to EFH, associated fisheries, and the nation, consistent with national Standard 7." 50 CFR § 600.815(a)(2)(iii).

60.     Rather than applying the proper statutory standard to the EFH protection analysis in the Amendment, the Council with NMFS's approval chose an approach that was "to maintain some of the existing habitat and groundfish closure areas while opening areas with less vulnerable habitat and closing some new areas of more vulnerable habitat where there was relatively little bottom trawl or dredge activity." Exhibit 2 (Decision Memorandum), at 16. This is a different and less protective approach than required by the MSA where impacts of fishing gears on EFH are to be minimized if practicable.

61.     Adopting the Council's use of this alternative standard and despite identifying a number of practicable alternatives that would improve habitat protections in the region at little or no cost to industry, NMFS approved measures that reduced the amount of EFH protected by over 40-percent, opening thousands of square miles of currently closed essential fish habitat to destructive forms of commercial fishing and closing areas with few fishing impacts.

62.     NMFS approval of the recommended EFH protection measures failed to rely upon the best available scientific information provided by the technical teams set up by the Council to provide supporting analysis to the various decisions.

63.     The legal flaws introduced into the Amendment process and results by NMFS's

13

application of the alternative EFH protection standard and by NMFS's failure to rely on the best available science are particularly notable in NMFS's actions in the three sub-regions of the Gulf of Maine.

        **a.**      **Eastern Gulf of Maine**

65.     The Habitat Plan Development Team ("Habitat PDT") was the technical group charged by the Council with undertaking all the supporting analyses for the EFH decisions under review by the Council and NMFS. *See* Exhibit 2 (Decision Memorandum), at 4.

66.     In the Eastern Gulf of Maine, the Habitat PDT identified "highly vulnerable coral aggregations in the Gulf of Maine that are more susceptible to the effects of fishing because of their relatively exposed locations (they are not on canyon walls). These areas have documented value specifically as essential fish habitat." *See* November, 26, 2012 Memorandum from Habitat PDT to Habitat Committee.

67.     The Habitat PDT requested that these areas be considered as "habitat management areas designed to minimize the adverse effects of fishing on EFH in Amendment." *Id.*

68.     The Habitat PDT indicated that there was a particular link between the structural habitats that these corals formed and Acadian redfish, one of the managed species with identified EFH for all life stages in the Gulf of Maine. *Id.*

69.     The Habitat PDT further expressed its concern that these coral habitats in the Gulf of Maine were at even greater and immediate risk of damage from the impacts of fishing gear as a result of regulatory changes in the redfish fishery. *Id.*

70.     Despite this scientific advice, the Habitat Committee did not advance a Gulf of Maine alternative that minimized the impacts of fishing gears on this coral EFH for further environmental review based in large part on anecdotal information provided by a commercial

fishing representative at a Committee meeting that there were not any conflicts between corals and the redfish fishery. *See* March 19, 2013 Habitat Oversight Committee Meeting Summary at 11-12.

71.     The proper legal standard to be applied here was not whether there were fishing gears being used in an area, but rather whether there were potential management actions that would minimize the adverse effects of fishing gears on vulnerable habitat in the area and whether those alternatives were practical.

72.     The coral EFH alternatives proposed by the Habitat PDT in its memorandum to the Council's Habitat Committee were reasonable, relevant, germane to the purposes of the federal action, and not contained in other alternatives considered in the Amendment EIS for the Gulf of Maine.

73.     NMFS's approval of the recommendations for the Gulf of Maine eliminated any review or analysis of a corals EFH alternative for the Gulf of Maine without a determination that such alternatives were not either necessary to minimize the impacts of fishing gears on these coral areas or were impracticable, the two controlling regulatory standards.

74.     The elimination of any Gulf of Maine coral EFH alternative from the Amendment precluded any agency or public scrutiny of the costs or benefits of EFH protection alternatives designed to minimize the impacts of fishing gears on these corals which are EFH for a council-managed species, if practicable.

75.     NMFS's approval of the Amendment, in the absence of any consideration of a coral EFH protection alternative violated its obligations under the MSA, was inconsistent with its own regulations implementing the MSA EFH protection measures and disregarded the scientific advice of the Habitat PDT without explanation.

75.     NMFS's approval of the Amendment without protections for coral EFH violated the MSA, 16 U.S.C. §§ 1853 (a)(7), and was arbitrary and capricious and not in accordance with law, contrary to the APA, 5 U.S.C. §§ 701-706.

76.      Defendants' violations of NEPA and the APA are causing irreparable injury to Plaintiff and its members for which Plaintiff and its members have no adequate remedy at law.

**b.     Central Gulf of Maine**

77.     The Amendment advanced several alternatives for minimizing fishing gear impacts to the extent practicable in the Central Gulf of Maine: Alternative 1 (No action) analyzed the habitat benefits and economic impacts of keeping the current Cashes Ledge Groundfish Closure Area, including the existing internal subset of that area referred to as the Cashes Ledge Habitat Closure Area, closed to mobile bottom-tending fishing gears as well as other gear capable of catching groundfish. Alternative 2 analyzed the habitat benefits and economic impacts to the fleet of no habitat closures at all. Alternative 3 created a new Fippennies Ledge Habitat Management Area ("HMA"), a new Platts Bank HMA, a new Ammen Rock HMA, a modified Cashes Ledge Habitat HMA and a modified Jeffreys Bank HMA but opened the rest of the current Cashes Ledge Groundfish Closure Area (Alternative 1) to fishing. Alternative 4 was the same as Alternative 3 without the new Fippennies and Platts Bank HMA.

78.     The scientists identified the Cashes Ledge Groundfish Closure Area, which lies generally between the newly-approved Fippennies Ledge HMA to the west and the Cashes Ledge HMA to the east, as EFH for multiple life stages of 17 managed fish species, including Atlantic sea scallops (slight); thorny and smooth skates; monkfish; yellowtail (slight) and witch flounder; white, silver and red hake; pollock; ocean pout (slight); American plaice; redfish; Atlantic cod (slight to moderate); Atlantic halibut; Atlantic wolfish; and haddock.

79.     The technical analysis by the Habitat PDT in the administrative record concluded that selection of Alternative 1 and Alternative 3 would minimize the effects of fishing gears on the multi-species EFH in the Cashes Ledge area with no economic costs to the fishing industry.

80.     NMFS's final action on this area, however, did not adopt the measures recommended for minimizing EFH impacts, approving instead the Council's recommendation to treat a large area in Alternative 1 as a "groundfish mortality closure," a temporary fishery management measure not related to EFH protection or impact minimization.

81.     NMFS's failure to designate the Cashes Ledge Groundfish Closure Area as a habitat management area with long-term restrictions to mobile bottom-tending fishing gears is unsupported by the record and not connected to the facts in the record that establish the superior conservation benefits of treating that area as a habitat management area at no cost to the industry.

82.     NMFS's approval of the Central Gulf of Maine Amendment recommendations without minimizing the impacts of fishing gears by protecting the Cashes Ledge Closure Area for habitat purposes in addition to the other actions taken violated the MSA, 16 U.S.C. §§ 1853 (a)(7), and was arbitrary and capricious and not in accordance with law contrary to the APA, 5 U.S.C. §§ 701-706.

83.     Defendants' violations of the MSA and the APA are likely to cause irreparable injury to Plaintiff and its members for which Plaintiff and its members have no adequate remedy at law.

### c.     Western Gulf of Maine

84.     The Habitat PDT identified a number of EFH areas that were vulnerable to adverse impacts from fishing gears in the Western Gulf of Maine area, including Tillie's Bank, Wildcat Knoll, Gloucester Bank, an area known as New Squantum off Jeffries Ledge and an

extension on the existing Western Gulf of Maine Closure. They were all eliminated from further analysis by the Council's Habitat Committee. The stated basis for eliminating further consideration of these areas was that "the Committee preferred to work with refinements to areas already managed, as opposed to additional areas." FEIS Vol. 3, p. 124.

85.     Numerous other critical EFH areas were identified for further analysis as alternatives by the Council's technical teams in the western Gulf of Maine, including areas in Massachusetts Bay and Cape Cod Bay, and a large inshore Gulf of Maine closure. All of these areas were eliminated by the Council or by committees of the Council for further analysis or public review on a variety of grounds: "extreme [concern] about the potential economic impacts," "rejected … due to concerns about economic impacts," and a committee determination "not to recommend year round habitat management area designations in state waters as a general rule." FEIS Vol. 3, p. 125.

86.     There is no data, analysis or cogent rationale supporting the elimination of any of these alternatives and no practicability analysis. The elimination of all these measures is particularly significant because of their geographical proximity or overlap with the Council's designated Inshore Cod Habitat Area of Particular Concern ("HAPC").

87.     In preface to NMFS's EFH regulations provide that "[p]roposed fishing activities that might threaten HAPCs may likewise receive a higher level of scrutiny." Indeed, the presence of an HAPC in the Council recommendation that NMFS disapproved in the Geroges Bank sub-region was used as a basis for the higher level of scrutiny the agency gave to that recommendation.

88.     Elimination of those areas for any consideration of their importance in minimizing the impacts of fishing gear on EFH or their potential impacts on the Inshore Cod

HAPC is contrary to the goals and purposes of the Amendment, not supported by the best available science, not supported by the administrative record, and arbitrary.

89.     NMFS's approval of the Council's recommended alternatives in the Western Gulf of Maine, which included a 25-percent reduction in current protections against the adverse impacts of fishing gears without review or even further analysis of the more protective alternatives recommended by the Habitat PDT fails to minimize impacts to EFH from fishing gears to the extent practicable.

90.     NMFS's approval of the Amendment recommendations for the Western Gulf of Maine without review of the alternatives recommended for analysis by the Habitat PDT violated the MSA, 16 U.S.C. §§ 1853 (a)(7), and was arbitrary and capricious and not in accordance with law, contrary to the APA, 5 U.S.C. §§ 701-706.

91.     Defendants' violations of the MSA and the APA are causing irreparable injury to the Plaintiff and its members for which the Plaintiff and its members have no adequate remedy at law.

## SECOND CLAIM FOR RELIEF

### NMFS VIOLATED THE NATIONAL ENVIRONMENTAL POLICY ACT BY FAILING TO CONSIDER A REASONABLE RANGE OF ALTERNATIVE HABITAT PROTECTION MEASURES.

92.     Paragraphs 1 through 91 are hereby re-alleged as though set out in full.

93.     The fundamental purpose of NEPA is to ensure that the public is aware of and able to scrutinize all relevant aspects associated with major federal actions: "NEPA procedures must ensure that environmental information is available to public officials and citizens before decisions are made and actions are taken." CEQ NEPA Regulations, 40 C.F.R. § 1500.1 "Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA." *Id.*

94.     Alternatives analysis is the "heart of the environmental impact statement." 40 C.F.R. § 1502.14. An agency must "rigorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated." *Id.*

95.     In the context of agency actions that intended to meet the statutory objective of minimizing the impacts of fishing gears on EFH to the extent practicable, NMFS is required to consider a reasonable range of alternatives "as defined in terms of EFH protectiveness." *Oceana v. Evans*, 384 F. Supp. 2d 203, 242 (D.D.C. 2005).

96.     While the fishery management council undertakes and prepares the NEPA decisional documents for NMFS, NMFS is solely responsible for ensuring that the NEPA analysis satisfies all legal requirements; a fishery management council's NEPA judgments are not entitled to deference.

97.     NMFS failed to consider a reasonable range of alternatives in the Amendment EIS in its analysis of EFH protection in the Western Gulf of Maine and in its failure to undertake a review of any alternatives associated with the protection of redfish coral EFH in the Gulf of Maine.

### a.     Failure to Analyze Reasonable Western Gulf of Maine Alternatives

98.     "FMPs should identify a range of potential new actions that could be taken to address adverse effects on EFH, include an analysis of the practicability of potential new actions, and adopt any new measures that are necessary and practicable." 50 CFR § 600.815 (a)(2)(ii).

99.     As noted above in paragraphs 84 and 85, the Council's technical teams preparing the FMP and EIS proposed numerous alternatives for habitat protection analysis in the Western Gulf of Maine that were categorically eliminated for further analysis at the council committee

level for wholly unsupported economic reasons and for irrelevant policy reasons. Amendment
EIS, Vol. 3, pp. 124-125.

100.    Many of these proposed alternatives involved areas of great EFH importance and
vulnerability to fishing gears that were not covered by any of the alternatives that the Council
brought forward for NMFS's analysis and review in the Western Gulf of Maine EIS.

101.    These eliminated EFH protection alternatives included numerous juvenile
groundfish "hotspots," "complex habitat areas," and "a large area in the inshore Gulf of Maine,"
*id.,* all of which were fully germane to the purposes and objectives of Amendment and the
habitat impact minimization requirements of the MSA.

102.    These EFH protection alternatives were eliminated for further analysis, public
scrutiny and any further NMFS analysis by various NEFMC committees for unsupported reasons
such as "extreme [concern] about the potential economic impacts," "rejected … due to concerns
about economic impacts," a committee determination "not to recommend year round habitat
management area designations in state waters as a general rule," and a "Committee prefer[ence]
to work with refinements to areas already managed, as opposed to additional areas." Amendment
EIS Vol. 3, p. 124 - 125.

103.    These alternatives were reasonable, relevant, and not contained in other
alternatives considered in the EIS. Contrary to NEPA requirements, NMFS approved the
elimination of these alternatives without discussion of its reasons for eliminating them from
further environmental review as required by NEPA regulations. 40 C.F.R. § 1502.14.

104.    The elimination of these reasonable alternatives precludes any agency or public
scrutiny of the economic costs, habitat benefits, or practicability considerations associated with
those eliminated alternatives as potential candidates for EFH protection.

105.    NMFS's failure to include those alternatives in its EIS analysis or explain the basis for their elimination violates the fundamental purposes of NEPA and, in turn, the APA.

106.    NMFS's approval of the Amendment recommendations for the Western Gulf of Maine without review of the alternatives recommended by the technical team for analysis violated NEPA, 42 U.S.C. §§ 4321-4370f, and was arbitrary, capricious and not in accordance with law, contrary to the APA, 5 U.S.C. §§ 701-706.

107.    Defendants' violations of NEPA and the APA are causing irreparable injury to Plaintiff and its members for which Plaintiff and its members have no adequate remedy at law.

**b.    Failure to Analyze Redfish Corals EFH Alternatives**

108.    As noted above in paragraphs 66 - 69 above, the Habitat PDT identified significant corals habitat in the Gulf of Maine that was important EFH for Acadian redfish and extremely vulnerable to adverse impacts from fishing gears.

96.    As further noted in paragraph 70 above, the Council's Habitat Committee decided not to advance any alternatives for the Gulf of Maine for further fisheries analysis or environmental review that would minimize the impacts of fishing gears on these corals habitats.

97.    The coral EFH impact mitigation alternatives proposed by the Habitat PDT were reasonable, relevant, germane to the purposes of the federal action, and not contained in other alternatives considered in the Amendment EIS for the Gulf of Maine. NMFS's approval of the Amendment's recommendations for the Gulf of Maine eliminated any NEPA review or analysis of these corals EFH alternatives without discussion of the agency's reasons for eliminating those alternatives as required by NEPA regulations. 40 C.F.R. § 1502.14.

98.    The elimination of any Gulf of Maine coral EFH alternatives from the EIS precluded the agency or the public from taking a "hard look" at the costs or benefits of those

EFH habitat management alternatives, which was the core purpose of the federal action being undertaken.

99.     NMFS's approval of the Amendment recommendations for the Gulf of Maine without consideration of coral EFH management alternatives and without explanation of the reason for their elimination is arbitrary, capricious, and contrary to law.

100.     NMFS's approval of the Amendment recommendations for the Gulf of Maine without review of any coral EFH minimization alternatives for analysis violated NEPA, 42 U.S.C. §§ 4321-4370f, and was arbitrary, capricious and not in accordance with law, contrary to the APA, 5 U.S.C. §§ 701-706.

101.     Defendants' violations of NEPA and the APA are causing irreparable injury to Plaintiff and its members for which Plaintiff and its members have no adequate remedy at law.

## PRAYERS FOR RELIEF

Wherefore, Plaintiff respectfully requests this Court to order the following relief:

1. Enter a declaratory judgment that the Defendants violated the MSA and the APA by failing to minimize adverse fishing gear impacts to the extent practicable in the three sub-regions of the Gulf of Maine;

2. Enter declaratory judgment that the Defendants violated NEPA and the APA by eliminating viable and relevant alternatives that were responsive to the goals and objectives of the agency action without analysis or rationale;

3. Enter an order requiring Defendants to disapprove the proposed habitat management actions in the three sub-regions of the Gulf of Maine and restore the *status quo ante* pending further action by the NEFMC consistent with the Court's decision;

4.   Maintain jurisdiction over this action until the Defendants are in compliance with the

Magnuson-Stevens Act, NEPA, the AP A, and every order of this Court;

5.   Award the Plaintiffs all their reasonable attorneys' fees and costs; and

6.   Provide such other and further relief as this Court deems just and equitable.

Respectfully submitted this 9th day of May, 2018.

*/s/ Erica A Fuller*
ERICA A. FULLER
D.C. Bar No. MA0001
PETER SHELLEY (*Pro Hac Vice* pending)
Mass. B.B.O. #544334
Conservation Law Foundation
62 Summer Street
Boston, MA 02110
Tel: 508-400-9080
Fax: 617-350-4030
efuller@clf.org
pshelley@clf.org
