**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

_____

|  |  |  |
|---|---|---|
| CONSERVATION LAW FOUNDATION, | ) | |
| | ) | |
| Plaintiff, | ) | Civ. No. 1:18-cv-1105-JEB |
| | ) | |
| v. | ) | |
| | ) | |
| WILBUR ROSS, et al., | ) | |
| | ) | |
| Defendants. | ) | |

_____ )


**<u>REPLY MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AND IN OPPOSITION TO DEFENDANTS' CROSS MOTION FOR
SUMMARY JUDGMENT</u>**

ERICA A. FULLER
D.C. Bar No. MA0001
PETER SHELLEY
Mass BBO No. 544334
Admitted _Pro Hac Vice_
CONSERVATION LAW FOUNDATION
62 Summer St.
Boston, MA 02110
(617) 850-1727 Telephone
efuller@clf.org
pshelley@clf.org

_Counsel for Plaintiff_

## <u>TABLE OF CONTENTS</u>

INTRODUCTION……………………………………………………………….....…1

  **I.   The Approved EFH Protection Measures Violate The MSA.** ………………...............3

  **A.  *Chevron* Step Two Deference**…………………………………………………………3

  **B.  NMFS' Action Ignored Practicable EFH Impact Reduction Measures.** …………7

     1.    NMFS' Action Is Not Based On The Section 303(a)(7)Standard. …………..……8

     2.    The Administrative Record Does Not Support NMFS' Action. ……………….....16

       *a.    NMFS does not accurately characterize the administrative record.* ..………...16

       *b.    The record compelled designating and protecting the entire Cashes Ledge Groundfish Mortality Closure as an HMA.* …………………………..………..18

  **II.  The FEIS Supporting NMFS' Decisions in the Gulf of Maine Violates NEPA.** ……19

  **A.   NMFS Improperly Failed To Consider Reasonable Alternatives.**………….…….20

  **B.   NMFS Failed To Consider A Full Spectrum Of Alternatives.** ……………………21

  **C.   NMFS Did Not Minimize The Adverse Effects Of Fishing On Corals EFH.** ........23

**CONCLUSION**………………………………………………………………………25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*American Oceans Campaign v. Daley*,
    183 F. Supp. 2d 1 (D.D.C. 2000)…………………………………………...............1, 22

*Anglers Conservation Network v. Pritzker*,
    139 F. Supp. 3d 102 (D.D.C. 2015)………………………………………….……………20

*City of Alexandria, Va. v. Slater*,
    198 F.3d 862 (D.C. Cir. 1999) ...................................................................................19

*Conservation Law Foundation v. Evans*,
    360 F.3d 21 (1st. Cir. 2004) ............................................................................1, 4, 14

*Conservation Law Foundation v. Pritzker*,
    37 F. Supp. 3d 234 (D.D.C. 2014) ..........................................................1, 2, 3, 16

*Conservation Law Foundation v. Pritzker*,
    37 F. Supp. 3d 254 (D.D.C. 2014)…………………………………………………….3

*Conservation Law Foundation of New England, Inc. v. Mosbacher*,
    No. 91-11759-MA, 1991 WL 501640 (D. Mass. Aug. 28, 1991)……………………………1

*Flaherty v. Bryson*,
    850 F. Supp. 2d 38 (D.D.C. 2012)…………………………………………………12, 15, 21, 22

*Foundation on Economic Trends v. Heckler*,
756 F.2d 143 (D.C. Cir. 1985*)* ...................................................................................24

*Nevada v. Dep't of Energy*,
    457 F.3d 78 (D.C. Cir. 2006) ......................................................................................19

*Oceana, Inc. v. Evans*,
    No. Civ.A.04-0811 (ESH), 2005 WL 555416 (D.D.C. 2005) ...........................4, 6, 7, 8 19, 21

*Oceana, Inc. v. Evans*,
    384 F. Supp. 2d 203 (D.D.C.), order clarified, 389 F. Supp. 2d 4 (D.D.C.2005)...................21

*Otay Mesa Property, L.P. v. U.S. Dep't of the Interior*,
    No. 13-cv-0240 (KBJ), 2018 WL 4608223 (D.D.C. Sept. 25, 2018)…………………………4

*Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*,
    255 F. Supp. 3d 101 (D.D.C. 2017) ...........................................................................20, 22

*United Techs. Corp. v. Dep't of Defense,*
   601 F.3d 557 (D.C. Cir. 2010)............................................................................20

*Yakima Valley Cablevision, Inc. v. FCC,*
   794 F.2d 737 (D.C. Cir. 1986)...........................................................................20

**STATUTES**

5 U.S.C. § 706(2)(A)...............................................................................................1

16 U.S.C. § 1853(a)(7).................................................................................. *passim*

16 U.S.C. § 1854(a)(3).........................................................................…...............15

42 U.S.C. § 4321 *et seq.*.........................................................................................2

**RULES & REGULATIONS**

40 C.F.R. § 1504.14(a)...........................................................................................19

40 C.F.R. § 1508.25................................................................................................24

50 C.F.R. § 600.815(a)(2)(ii) & (iii).................................................................4, 8,10

# INTRODUCTION

Conservation Law Foundation ("CLF") fully appreciates the narrow standard of review applicable to judicial review of an agency action under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), and the deference due to defendants by virtue of their expertise in scientific or technical areas. *E.g., Conservation Law Found. v. Pritzker (*"CLF I"*),* 37 F. Supp. 3d 234 (D.D.C. 2014)*; Conservation Law Found. v. Evans* (*"CLF II"*)*,* 360 F.3d 21 (1st Cir. 2004); and *American Oceans Campaign v. Daley,* 183 F. Supp. 2d 1 (D.D.C. 2000)*.*

The issues CLF raises here follow a fourteen-year process under section 303(a)(7) of the Magnuson-Stevens Fishery Conservation and Management Act ("Magnuson-Stevens Act" or "MSA"), 16 U.S.C. § 1853(a)(7), to comprehensively identify and protect essential fish habitat ("EFH") in New England waters. CLF's concerns are central to Congress' purposes in amending the MSA to protect EFH from fishing impacts. They also go to the heart of the injuries suffered by CLF and its adversely injured members. For decades, the National Marine Fisheries Service ("NMFS") and New England Fishery Management Council ("Council") have failed to restore optimum yield to some of the Nation's oldest fisheries, at least in part by failing to protect the essential fish habitats of managed species as directed by Congress. Important species like Atlantic cod and yellowtail flounder have formally been in an overfished status since 1989. *Compare, e.g.,* EFH 6703 *with Conservation Law Found. of New England, Inc. v. Mosbacher*, No. 91-11759-MA, 1991 WL 501640, at *1 (D. Mass. Aug. 28, 1991).

Congress enacted section 303(a)(7) to protect the direct linkages between the conservation of EFH, fish stock productivity, and the achievement of optimum yield. Congress wrote the language as a forcing mechanism, directing NMFS to "minimize to the extent practicable the

adverse impacts of fishing on [EFH]." *See* CLF Mem. (ECF 25-1) at 13-15.[1]

NMFS failed to apply the express terms of that Congressional mandate when it approved the Gulf of Maine portions of the Omnibus Essential Fish Habitat Amendment 2 ("Habitat Amendment") that are at issue here. NMFS argues its challenged actions are defensible because NFMS "encourage[d] [EFH] conservation to the extent practicable . . . ." NMFS Mem. (ECF 26-1) at 9. NMFS asks this Court to defer to an agency interpretation of section 303(a)(7) that defeats Congress' goal of achieving optimum yield from the nation's fish resources rather than advancing it. A review of the administrative record demonstrates that NMFS ignored the plain meaning of section 303(a)(7), notwithstanding its conclusory claims that its actions here "minimize[d] adverse effects on [EFH] to the extent practicable in the Gulf of Maine." *E.g.,* NMFS Mem. at 9.

NMFS further argues that their actions challenged here comply with the requirements of the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq*., stating: (i) they took a "hard look" at the effects by considering a reasonable range of alternatives, NMFS Mem. at 36-40; (ii) they conducted their own independent analysis of the Council's recommendations*, id.* at 44-45; and (iii) that it was lawful to segment the environmental analysis of corals as essential fish habitat for council-managed species under section 303(a)(7) into a future amendment. NMFS Mem. at 45-47. These arguments fail because NMFS does not make a persuasive case that the adverse environmental effects of its proposed actions were properly analyzed under NEPA.

NMFS contends that this Court must uphold the agency's action because it was rational and supported by the administrative record. *Id*. at 9. This Court has properly described the legal standard differently: "[C]ourts 'have held it an abuse of discretion for [an agency] to act if there is no evidence to support the decision or if the decision was based on an improper understanding of

---

[1] Citations to documents filed through the ECF system will be referenced by the ECF pagination.

the law." *CLF I*, 37 F. Supp. 3d at 240-241 (citation omitted).

**I.    The Approved EFH Protection Measures Violate The MSA.**

    **A.    *Chevron* Step Two Deference**

       Defendants are quick in their effort to pull the "highly deferential" cloak of Step Two *Chevron* deference over their interpretation of section 303(a)(7). NMFS Mem. at 17-21. But as their dictionary exercise demonstrates, the words that Congress used in section 303(a)(7) are not technical or ambiguous terms susceptible to multiple meanings. NMFS agrees with CLF that "minimize" is unambiguous: reducing something "to the smallest amount possible*." Id.* at 18. The ordinary meaning of "practicable" is also straightforward: "'able to be done,' 'successfully,' 'feasible,' and 'practical.'" *Id.* There is only one sense of the word, a sense that is not vague or ambiguous. Accordingly, the Court need go no further than *Chevron* Step One. *See Conservation Law Found. v. Pritzker,* 37 F. Supp. 3d 254, 266 (D.D.C. 2014)(undefined statutory terms should be given "'their ordinary, contemporary, common meaning'").

       What courts reviewing this mandate *have* concluded is that Congress could not have intended that all the varied mandatory fishery management plan ("FMP") provisions be maximized simultaneously. "Practicable" implicitly requires that NMFS not focus on the EFH ecological benefits exclusively but must also weigh them against socio-economic factors. CLF recognizes that the various MSA measures must be read together in the context of the purposes of the FMP and does not dispute that here. While NMFS is ultimately entitled to deference in how it strikes that balance, it must consider the relevant factors in striking that balance, rationally connect the "facts found and the choice made," and base their review on a proper application of the law. *CLF I,* 37 F. Supp. 3d at 240-241. CLF does not conflate "practicable" with "possible" here. NMFS Mem. at 20. CLF argues that "practicable" should be determined based its ordinary meaning.

       *CLF I,* for example*,* did not turn on the highly deferential *Chevron* Step Two analysis of

the agency's interpretation of either "minimize" or "practical." In fact, this Court concluded in that case that CLF's arguments failed *because* CLF ignored the "express terms" of the Magnuson-Stevens Act mandate that EFH protection minimization measures be practicable. *Id.,* 37 F. Supp. 3d at 251. Similarly, *CLF II* was not a *Chevron* Step Two analysis of the agency's interpretation of "practicable." *See* 360 F.3d at 27-28. The appeals court there concluded that plaintiffs' claim that four areas should have been closed to scallop fishing improperly looked at those specific closure alternatives in isolation from the other conservation measures in that FMP with EFH benefits. *Id.* at 28. The *CLF II* court determined that the facts in the administrative record demonstrated that the benefits of the closure alternative plaintiffs advocated were speculative, not aligned with the FMP's overall objectives, and not necessarily any better in terms of the EFH benefits than if the areas were left open. *Id.*

Only one court has applied a Step Two *Chevron* analysis, concluding that Congress was vague on what management means and tools would be sufficiently practicable when minimizing fishing impacts on EFH. *See Oceana, Inc. v. Evans*, 2005 WL 555416, at * 35 (D.D.C. Mar. 9, 2005). The *Oceana* court deferred to NMFS' interpretation of "practicability" in its EFH guidelines. *Id. See* 50 C.F.R. 600.815(a)(2)(ii) & (iii).

In any event, NMFS' action here fails even under a *Chevron* Step Two analysis. The consistency of NMFS' actions with the controlling statutory terms is the lodestar of the *Chevron* Step Two inquiry. *See, e.g., Otay Mesa Property, L.P. v. U.S. Dep't of the Interior*, No. 13-cv-0240 (KBJ), 2018 WL 4608223, at *8-9 (D.D.C. Sept. 25, 2018) (agency interpretation must be "permissible and reasonable" reading of the statute). NMFS' formal interpretation of the EFH mandate is both permissible and reasonable: "FMPs should . . . adopt *any* new measures [that "could be taken to address adverse effects on EFH"] that are necessary and practicable." 50 C.F.R.

4

§ 600.815(a)(2)(ii) (emphasis added). Further, "[i]n determining whether it is practicable to minimize an adverse effect from fishing, Councils should consider the nature and extent of the adverse effect on [essential fish habitat] and the long and short-term costs and benefits of potential management measures to [essential fish habitat], associated fisheries, and the nation." 50 C.F.R. § 600.815(a)(2)(iii).

The purpose of the Habitat Amendment is consistent with this interpretation:

> Councils *must prevent, mitigate, or minimize any adverse effects* from fishing on EFH if there is evidence that a fishing activity adversely affects EFH in a manner that is more than minimal and not temporary in nature. Councils should consider the nature and extent of any adverse effects along with the long and short-term costs and benefits of the management measures to EFH, associated fisheries, and the nation.

EFH 55726 (emphasis added).

In the Record of Decision, NMFS indicated that it had applied the following interpretation to "practicability":

> Management measures that are implemented to achieve [the statutory] requirement need to both *ensure adverse effects . . . are minimized* **and** that they are *minimized in a practicable way*.

EFH 8939 (emphasis added). CLF's problem is not with the NMFS' *Chevron* interpretation but with the fact that NMFS never actually applied its own interpretation of "practicable" to EFH protection in the Gulf of Maine, focused instead on "encouraging" the Council and "improving" EFH protections.

NMFS identified numerous adverse impact minimization measures that the evidence in the record demonstrated would have produced significantly fewer adverse EFH impacts from fishing than the EFH measures approved. Virtually all of these measures were also determined by that same analysis to be "practicable." They were not selected because they were not practicable, but

because the Council didn't like them for one vague reason or another, none of which were supported by evidence in the record. CLF cannot find a single, demonstrated circumstance in the record where the alternatives with the highest EFH benefits were predicted to produce more than "moderately negative" economic and social impacts, let alone the "extreme economic hardship" NMFS practicability standard requires. *See* EFH 3268 and *compare* EFH 3270 (costs/benefits table of selected EFH alternatives) *with* EFH 3271.

Finally, contrary to the administrative record and NMFS' prior interpretation in *Oceana v. Evans* that the Cashes Ledge Groundfish Mortality Closure was neither intended to nor functioned operationally as an EFH protection measure because the EFH benefits were only incidental and temporary, *see Oceana,* 2005 WL 555416, at *33, NMFS specifically relied on the Cashes Ledge Groundfish Mortality Closure here as an EFH management measure designed to minimize adverse EFH impacts. EFH 55738. *See* NMFS Mem. at 19-20. And yet, NMFS' final action did not even protect that the vast majority of that mortality closure for its habitat value. NMFS made no effort to distinguish that decision from its decision to protect Fippennies Ledge for its habitat value or its decision to protect Jeffreys Ledge in the Western Gulf of Maine simultaneously with both habitat protection and mortality protection. EFH 55726.

NMFS justified its decision by arguing that the mortality closure was an even better protection measure for the groundfish resource than an actual EFH habitat management designation would have been. EFH 55738. This argument makes no sense; virtually the same fishing gears are restricted in the new Fippennies Habitat Management Area ("HMA") and the Cashes Ledge Groundfish Mortality Closure. *See* EFH 6754. Any habitat management designation could include the same range of gear restrictions as a mortality closure could up to almost a full closure as was done with the Ammen Rock HMA in this same area. *See Id. &* EFH 7809. NMFS'

claim is also inconsistent with its own rationale for converting the mortality closure in this area covering Fippennies Ledge to an HMA status. The agency justified that action by stating: "[S]hould the Cashes Ledge Groundfish [Mortality] Closure be removed or modified . . . Fippennies Ledge still warrants protection from the adverse effects of mobile bottom-tending gear." EFH 55727. The same arguments hold true for the remainder of the groundfish closure area.

"Mortality closures" were neither defined nor used in the Habitat Amendment for EFH protection purposes. *See, e.g.,* EFH 7149 (describing the three types of spatial habitat management measures). While mortality closures can provide incidental EFH habitat benefits, *see Oceana, Inc.,* 2005 WL 555416, at *33, the Habitat Amendment properly drew a clear distinction between mortality closures and gear restrictions for groundfish protection purposes and habitat closures and gear restrictions for EFH protection purposes. The Cashes Ledge Groundfish Closed Area was analyzed for its habitat value, not for its value as a mortality closure. *See* CLF Mem. at 41-42. It was arbitrary and an abuse of discretion for NMFS to fail to protect the entire area for its habitat value on this record.

**B.     NMFS' Action Ignored Practicable EFH Impact Reduction Measures.**

CLF must first respond to several peripheral arguments that NMFS makes against CLF's action. First, NMFS argues that CLF has "discounted" earlier EFH protection measures that are in place. NMFS Mem. at 40. We have not. The Habitat Amendment was a superseding agency action that "reevalute[d] and integrate[d] habitat measures across the fisheries managed by the Council, and . . . update[d] these measures given new scientific information about habitat distributions and fishing impacts." EFH 7792, 55725, and *see* NFMS Mem. at 12. NMFS' argument that there are EFH adverse effects reduction measures taken in other FMPs that were somehow implicitly considered in their decision here, *id.* at 14, 40, is belied by the administrative record. None of those other EFH actions are even identified as EFH protection measures in the record. *E.g.,* EFH 55726

(approved habitat management measures).

Second, NMFS claims that designation of an area as a Habitat Area of Particular Concern ("HAPC") alone confers direct EFH protection benefits. NMFS Mem. at 33. NMFS knows full well that HAPCs are non-regulatory designations. EFH 7792. "[N]o new [EFH habitat] measures are implemented as part of the HAPC designations in this amendment." EFH 55726.

NMFS also faults CLF's statement that HMA designation gives an area "indefinite long-term EFH protection[,]" NMFS Mem. at 33, "[HMAs] are not indefinite. . . ." The record, however, specifically defines HMAs as functioning on "an indefinite, year-round basis, and the fishing restriction measures focus, primarily, on minimizing [EFH] impacts associated with mobile bottom-tending gears." EFH 7808. Groundfish mortality closures are not habitat management measures. A groundfish mortality closure, whether year-round or seasonal, functions to protect the groundfish resource, not the habitat, EFH 55733, by restricting gear capable of catching groundfish. EFH 7809. *Oceana,* 2005 WL 555416, at *33. A mortality closure may have incidental benefits for EFH in the closed area but they are not deemed by the Habitat Amendment to be a spatial EFH protection management measure. *E.g.,* EFH 7149. Similarly, mortality closures provide incidental spawning benefits but are not deemed to be spawning closures for management purposes. EFH 6829.

1.    NMFS' Action Is Not Based On The Section 303(a)(7) Standard.

Whether a *Chevron* Step One or Step Two analysis applies here, NMFS' approval of the Habitat Amendment required it to "adopt *any* new [EFH protection] measures . . . that are necessary and practicable," 50 C.F.R. § 600.815(a)(2)(ii)(emphasis added), that is, implement habitat protection measures that "ensured" adverse effects from fishing on vulnerable EFH were minimized unless implementing those EFH measures caused "extreme economic hardship."

The administrative record provides a ready and direct demonstration of NMFS' flawed

application of its own interpretation of section 303(a)(7) here. The Habitat Amendment has summary tables and descriptions for all of the various alternatives analyzed and their associated ecological, economic, and social costs and benefits. EFH 3266-3269 (cost/benefit summary tables); EFH 4175-4182 (cost/benefit practicability analysis); EFH 7808-7814 (analyzed alternatives described); EFH 7836-7840 (cost/benefit summary tables of alternatives). While this summary material is qualified in the record as a "guide," EFH 4175, it was developed explicitly for the purpose of identifying the various cost and benefit tradeoffs in front of NMFS and was developed using a best case/worst case approach. *Id.*

In the Eastern Gulf of Maine, only two alternatives were projected by the analysis to produce even "moderately negative" human community impacts: Alt. 1, where no EFH protection measures would be implemented; and Alt. 2 (Options 1, 2 & 5) because of the potential to restrict the herring fishery. EFH 7840, 7809. All of the other EFH protection alternatives were "slightly negative," "slightly positive," or "neutral." EFH 7840. All the alternatives were practicable under an ordinary reading of the MSA or NMFS' practicability standard. The Habitat Amendment itself concluded they all were practicable, except the alternative that had no EFH protection and two alternatives involving gear modifications. EFH 4177. Yet without reference to record support, NMFS refused to select two of the alternatives that reduced the adverse effects of fishing on EFH significantly more than the alternative selected. EFH 7837.

In the Central Gulf of Maine, none of the alternatives analyzed by the Council that produced positive EFH benefits were projected to have more than "slightly negative" impacts on human communities, EFH 7840, and the alternatives that protected the entire pre-existing groundfish mortality closure in the Central Gulf for EFH protection purposes had significant positive socio-economic benefits to fishers. In fact, the analysis concluded that protecting the entire

Cashes Ledge Groundfish Mortality Closure with indefinite habitat protections produced the highest social and economic benefits of all the alternatives. *Id.*

Under NMFS' interpretation of the section 303(a)(7) mandate and the evidence in the Habitat Amendment itself, this full EFH protection closure was practicable. EFH 4177-79. Yet without good reason, NMFS was only willing to extend EFH management protections to two smaller areas within that closure. As noted above, the rest was designated by NMFS as a groundfish mortality closure. Record of Decision (ECF 1-1) at 13. The only explanation why the vulnerable habitat on Fippennies Ledge, previously just covered by the mortality closure, received new HMA status while the vulnerable habitats in the largest portion of the mortality closure did not is that a mortality closure alone would not adequately protect Fippennies vulnerable EFH. *See* 55727; NMFS Mem. at 20. That rationale directly contradicts NMFS' justification for *not* protecting the vulnerable EFH in the remainder of the mortality closure. *See* EFH 55738. Again, the gear restrictions in each are virtually identical. See above at 6.

The approved decision also eliminated any EFH protection for Platts Bank, which was part of an alternative that was determined to be practicable, Alternative 3. EFH 7840, 4178. The agency's basis for elimination of this additional protection was "[Council] concerns over economic impacts and displacement of fishing activities currently occurring there." EFH 7172. But the practicability analysis specifically looked at that question and concluded otherwise. The question before NMFS was not whether fishing was happening on Platts Bank but whether the identified measures to reduce adverse impacts on EFH from fishing on Platts Bank could be achieved practicably. The analysis specifically designed for that purpose said they could. Counsels' *post hoc* explanation that Platts Bank did not get EFH protection because it had the second lowest score for EFH overlap, NMFS Mem. at 32-33, is unsupported by the record. The benefits of protecting

Platts Bank EFH scored only one "point" lower than Fippennies Ledge where an HMA was created, EFH 6230 – 6231.

In the Western Gulf of Maine, the agency's practicability analysis concluded that none of the alternatives would produce more than "moderately negative" socio-economic impacts with the exception of the "highly negative" impacts on the shrimp industry produced by two of the thirteen variants analyzed. EFH 4179, 4181. If the potential negative impacts on the shrimp fleet were mitigated, as NMFS did in its selected alternative, all the analyzed alternatives that proposed EFH protection measures were practicable based on NMFS' practicability standard.

The Council's economic analysis confirms this. Keeping the entire current mortality closure closed for EFH protection purposes was deemed practicable, EFH 4180, and produced superior beneficial EFH results to NMFS' selection. EFH 7837. The Council deemed other alternatives "somewhat impracticable" in the short term, EFH 4180, and others were deemed by the Council to be "not practicable" even though the analyzed costs to fishers were only "generally neutral or negative." *Id.* A number of the alternatives that scored the highest for EFH benefits were not deemed "not practicable;" rather, they scored as having relatively "lower practicability." EFH 4180. The Council's analysis of at least three of those alternatives, however, produced far superior EFH protection benefits than the alternative NMFS selected. *See* EFH 7837 (*compare* Alt. 1, Alt. 3 (Options 1 & 2), Alt. 4 (Options 1 & 2) *with* selected Alt. 1 with modified boundary).

In summary, there were multiple, analyzed management measures that were available to NMFS in all three sub-regions of the Gulf of Maine that: 1) would have produced significantly better results in terms of minimizing adverse effects of fishing on EFH, and 2) were deemed practicable by the Council's analysis and NMFS. Without evidence-based reasons, NMFS chose none of those alternatives, deferring to Council preferences to increase fishing access.

In truth, NMFS itself recognized that the Habitat Amendment was not about implementing Congressional intent to minimize EFH impacts from fishing to the extent practicable. Rather, "[t]he Amendment's focus . . . [was on] minimizing the total area closed to fishing, while maximizing the amount of vulnerable habitat protected." EFH 8878. The EFH measures were approved because they "'represent[ed] an improvement to groundfish protections.'" EFH 55731. That metric is not consistent with the Habitat Amendment's purposes or Congress' mandate.

To minimize impacts on fishers rather than EFH, NMFS consistently and without justification or explanation applied a lower EFH protection standard than its own interpretation of section 303(a)(7). For example, NMFS argues here that the purpose of the Habitat Amendment was to "encourage" the conservation of EFH. NMFS Mem. at 9. NMFS defends its EFH protection choices as consistent with Section 303(a)(7) "because they improve protection of vulnerable EFH and groundfish stocks while reducing adverse economic impacts." *Id.* at 32. NMFS describes the amendment's approach as "identify[ing] closures that would be at least as protective as existing closures, but would offset some costs for fishing communities." *Id.* at 17. That is not the practicability analysis that section 303(a)(7) required. *See Flaherty v. Bryson,* 850 F. Supp. 2d 38, 56 (D.D.C. 2012)(agency must actually consider whether actions "minimized to the extent practicable").

NMFS' justifications, however, rely on that faulty interpretation. The alternative the agency approved in the Eastern Gulf of Maine would "'provide[] potential long-term benefits with minimal costs to the fishing industry.'" NMFS Mem. at 19. Section 303(a)(7)'s mandate was accomplished, according to NMFS, because the selected EFH alternative was "slightly positive" " even without further protection," *id.* at 18, and because the areas not selected for protection were not "highly vulnerable to adverse effects from fishing." *Id.*

Establishment of two HMAs in the Central Gulf of Maine "provide[d] additional EFH protection. . . ." *Id.* at 19. NMFS approved the Council's alternative because it "'ensured that a more diverse array of bottom habitats that support a greater variety of species remain protected from fishing impacts[,]'" *id.* at 20 (citation omitted), and protected ''the most highly vulnerable [habitat features] in the sub-region.'" *Id.*

In the Western Gulf of Maine, NMFS disingenuously stated that the alternative they selected was "'selected to maintain decades' worth of protections in this region, while modestly increasing fishing access." *Id.* at 20-21 (25 percent loss of protection). The selected alternative would "'minimize the adverse impacts of fishing . . . at approximately the same level' but 'in a less costly, more practicable way.'" *Id.* at 21. The practicable alternatives protecting highly vulnerable Bigelow Bight HMA in the Western Gulf of Maine were eliminated for any EFH protection because the economic impacts were "deemed by the Council" to be "negative." *Id.* at 27-28.

Later, NMFS defends its EFH decisions because they "'maintain the same positive impacts on habitat . . . as the existing closures, with the same economic benefits[,]'" NMFS Mem. at 34, and because they are "projected to have neutral or positive impacts on EFH as compared to the no action alternative." *Id.* None of these constructions are consistent with the MSA's express terms.

The section 303(a)(7) question in front of NMFS was not whether beneficial EFH protections might produce negative economic impacts or how fisher access to closed areas could be increased. It was not whether the Council's selections were improvements on or about the same as existing EFH protections. It was whether the various analyzed habitat protection measures produced demonstrable EFH benefits, and if they did, were they practicable to implement? NMFS cannot delegate that decision to the Council or fail to adopt protective EFH management measures

as it did here if the evidence in the record does not reveal significant economic impact, NMFS' "extreme economic hardship" standard.

As the following examples demonstrate, NMFS' improper focus on "encouraging" marginal improvements in EFH protection and "minimizing the total area closed to fishing" as opposed to ensuring that Congress' intent was executed is apparent from the administrative record. In the Eastern Gulf, NMFS approved the selection of an alternative that did not minimize fishing gear impacts as well as other alternatives because "selection of the largest alternative was not required to improve protection." EFH 6758. In the Western Gulf, NMFS selected its alternative because "the modified closures combined with various other management measures would provide sufficient conservation for cod and other depleted stocks." EFH 6758-6759. There is no evidence supporting this in the record even if the legal standard was "sufficiency." Looking over all of its choices, NMFS stated: "Overall . . . NMFS has determined that the collective measures in the Gulf of Maine represents an improvement to groundfish protections." EFH 55731. That was not the purpose of the Habitat Amendment or the Congressional mandate.

NMFS makes several unpersuasive arguments about why the Court should defer to the agency here, all variations on the theme that NMFS' decisions demand deference from this Court because "the Council appropriately applied 'expertise and discretion in determining how best to manage fishery resources[,]'" NMFS Mem. at 28, quoting *CLF II,* 360 F.3d at 28.

This Court does not owe, and should not give, the New England Fishery Management Council any deference or sanction NMFS' deference to the Council here. Fishery management councils function solely as non-regulatory advisory bodies to NMFS; they are not "quasi-legislative" in nature as claimed by NMFS. *Id.* at 10. Congress was extremely careful to restrict the fishery management councils from exercising any regulatory or executive functions. Moreover,

14

the New England Fishery Management Council has not actually demonstrated any particular expertise in fisheries management. Multiple species managed by the Council are in chronic overfished status or are subject to overfishing, including many stocks that are highly dependent on EFH in the Gulf of Maine that NMFS is not protecting here. *See* CLF Mem. at 10, 15, 17, 20-21.

NMFS' highly deferential stance to this Council's "expertise and discretion," in fact, is one of the bases of CLF's challenge here of NMFS' approval of the Gulf of Maine EFH measures. NMFS repeatedly delegated both significant MSA and NEPA functions to the Council over the course of the Habitat Amendment process, from allowing the Council to unilaterally eliminate viable EFH alternatives advanced by NMFS' own scientists without any NEPA or EFH analysis to artificially limiting the range of alternatives to be included in the Habitat Amendment's NEPA documents. NMFS has no legal basis for deferring to Council actions: "[m]ere deference to the Council, with nothing more, does not demonstrate reasoned decision-making." *Flahery v. Bryson,* 850 F. Supp. 2d at 56.

NMFS' job is to apply the law to proposed FMPs and regulations that the councils develop: "approve, disapprove, or partially approve[,]" not defer. 16 U.S.C. § 1854(a)(3). *Flaherty,* 850 F. Supp. 2d at 55. (NMFS charged "in no uncertain terms" with ensuring compliance with the law). NMFS deferred to Council actions based on their unsubstantiated anecdotal and economic arguments or their notions of practicability without fully supporting that deference by reference to the record. *See* CLF Mem. at 10-11. It is not enough for NMFS to say that it selected measures that "minimize[d] adverse impacts to habitat[,]" *e.g.,* NMFS Mem. at 34, if the record doesn't support that claim. Here, even the record reference that NMFS cites to this Court to show it has minimized impacts if practicable discloses what the agency actually did: "The new set of measures maintained the same positive impacts on habitat and groundfish resources as the existing closures."

EFH 8919.

    2.    The Administrative Record Does Not Support NMFS' Action.

There is not a rational connection between the facts in the administrative record and the final choices made by the agency, as required by the APA. *E.g., CLF I,* 37 F. Supp. 3d at 241.

    *a.    NMFS does not accurately characterize the administrative record.*

The following is an illustrative list of the variances between NMFS' characterizations of the record and its actual contents. In the Eastern Gulf of Maine, for example, NMFS states that "under the SASI analysis, the [Machias] area is not highly vulnerable to adverse effects from fishing." NMFS Mem. at 18, 39. The record says: "According to the SASI vulnerability analysis . . . habitats in the Machias area are likely *somewhat less* vulnerable to accumulating adverse effects of fishing [than the more complex substrates]." EFH 6219 (emphasis added). "The Machias area was developed [by the scientists] to minimize the adverse effects of fishing on juvenile cod, haddock, and halibut habitats." EFH 7166.

NMFS defends its decision to forego protection of the Machias EFH on the basis that the area "was subject to an ongoing boundary dispute with Canada." NMFS Mem. at 39. The record shows that most of the analyzed Machias HMA is outside the Grey Zone and in uncontested U.S. waters. *See* EFH 50095. NMFS states that "[the Toothaker Ridge] area consists mainly of less vulnerable mud substrate." NFMS Mem. at 18. The record evidence is that the Toothaker Ridge HMA "cover[s] areas of complex benthic habitat with rocky substrates. . . [;] it appears that the habitat type within the Toothaker Ridge area is *relatively less* vulnerable and consists mainly of mud-dominated areas." EFH 6221 (emphasis added). "The Toothaker Ridge area was developed specifically for juvenile groundfish habitat protection, and includes juvenile redfish and witch flounder habitat." EFH 7167-7168. Witch flounder is one of the many officially overfished stocks of fish in the Gulf of Maine that are not producing optimum yield. *See* EFH 6703. The Machias

16

and the Toothaker Ridge HMAs both scored "high" values as both juvenile hotspots and as EFH for various life stages of overfished groundfish species, *see* EFH 6215 (Table 7), and the Toothaker Ridge HMA overlapped with notable areas in the species persistence analysis. EFH 6221.

NMFS implies repeatedly that mud habitats are not vulnerable EFH subject to Section 303(a)(7)'s mandate or worthy of EFH protection: *e.g.,* "selected Small Eastern Maine HMA contains nearly the same amount of vulnerable habitat (*i.e.,* hard bottom rather than mud) as the Large Eastern Maine HMA." NMFS Mem. at 19. The EFH science in the record indicates that mud EFH is *relatively* less vulnerable than other more vulnerable EFH. EFH 6221. The record, in fact, contains numerous references to the vulnerability of mud habitats to fishing. *E.g.,* EFH 6235 (mud biota has lengthy recovery times); EFH 6239 ("trawl impacts in deep mud habitats could generate adverse effects"). More to the point of the FMP's purpose, mud habitats were identified as critical EFH to various life stages of virtually all the managed species in the Gulf of Maine. *See* EFH 7795-7803, 6570-6656.

Justifying its decision to approve a 25 percent reduction in the groundfish mortality closure in the Western Gulf of Maine, NFMS argued that "the area remaining closed [by the new smaller HMA] has more vulnerable habitat than the area being opened." EFH 55731. The decision before NMFS, however, was not between the quality or quantity of the EFH in the area being opened versus the quality or quantity in the new smaller EFH protected area. It was between an alternative that included *both* those areas and scored significantly higher for EFH protection and the alternative NMFS selected that was 25 percent smaller and scored lower. The area being opened would have protected even *more* highly vulnerable habitat than the smaller selected alternative does alone, *see* EFH 6244 (Table 16), EFH 6246, including the "notable shallow feature, Wildcat Knoll." EFH 6254-56.

NMFS again justifies that 25 percent reduction in EFH protection because the area opened "contains muddier, less vulnerable habitat" and "primarily deeper, low vulnerability mud habitats." NMFS Mem. at 20-21. The record, however, indicates that both that area and the smaller area NMFS protected for its EFH habitat values have approximately the *same* amount of mud EFH. EFH 6244 (Table 16), EFH 6254 (six percent difference). NMFS argues that its approved measures in the Western Gulf of Maine "represent an improvement to groundfish protections[,]" NMFS Mem. at 40, however, the evidence is otherwise: the new EFH measures are "slightly less beneficial than the status quo [that doesn't open the 25 percent to fishing]." EFH 55731, 7837 (*compare* WGOM Alt. 1 (no action) *with* the approved Alt. 1 with modified boundary).

> b.   *The record compelled designating and protecting the entire Cashes Ledge Groundfish Mortality Closure as an HMA.*

The EFH analysis in the record for the pre-existing Cashes Ledge Mortality Closure Area concluded that the EFH throughout the area was vulnerable to the adverse effects of fishing. EFH 7917, 7919-7922, 6228. The ecological, economic and social practicability analysis of a long-term closure of that area for EFH protection purposes concluded that it provided the highest EFH benefits and was economically beneficial to fishers. EFH 7837, 7840. NMFS created the Fippennies Ledge HMA out of a small portion of that closure because it recognized that additional EFH protections were necessary and practical beyond the incidental and temporary benefits of the mortality closure. EFH 55727. Yet, NMFS refused without justification to provide the same EFH protections to the full closure. The public strongly supported permanently protecting the EFH in the entire Cashes Ledge Groundfish Mortality Closure for its EFH habitat values. *E.g.,* EFH 5019 (2,233 comments submitted to permanently protect the Closure), 55546-55547.

NMFS refused to do so, however, deferring instead to the Council and relying on a makeshift rationale regarding the habitat benefits of mortality closures that the agency itself and a

court had already determined to be temporary and incidental. See pp. 6-7 above. The record evidence is that the vulnerable EFH remaining under only groundfish mortality protections merits full EFH protection just as much as that on top of Fippennies Ledge did. The decision to deny full EFH protection has no basis in the record, is arbitrary and an abuse of discretion.

**II.   The FEIS Supporting NMFS' Decisions in the Gulf of Maine Violates NEPA.**

In evaluating a NEPA challenge, a court must determine: "(1) whether an agency's objectives are reasonable, and (2) whether a particular alternative is reasonable in light of these objectives." *City of Alexandria, VA v. Slater,* 198 F.3d 862, 867 (D.C. Cir. 1999). *See also Oceana, Inc.*, 2005 WL 555416, at *31 (range defined by federal action's purpose). In this case, the FEIS' stated objectives--minimizing the adverse effects of fishing on EFH to the extent practicable--are prescribed by statute. Attention, therefore, should be focused on the second part of the inquiry.

NMFS argues that it did not "rubber stamp" the Council's actions in alternative selection and analysis; it made its own "independent assessment" of the reasonableness of the range of alternatives and the environmental effects of the action. NMFS Mem. at 44. The record does not support that claim; the requisite "hard look" required more. 40 C.F.R. § 1504.14(a). *E.g., Nevada v. Dep't. of Energy,* 457 F.3d 78, 92-93 (D.C. Cir. 2006).

NMFS' NEPA analysis in the Gulf of Maine ignored--and thus never analyzed--viable alternatives proposed by its own EFH scientists, alternatives that those experts had determined were reasonable in light of the FMP's objectives. Moreover, the range of alternatives NMFS *did* consider was unreasonable because it did not include a reasonable spectrum of policy choices that met the purposes of the federal action. NMFS admits that none of the alternatives receiving NEPA analysis, except in the Eastern Gulf of Maine, explored "expan[ding] . . . existing protections within the current closed areas or the size of protected areas." EFH 55735.

NMFS' defense of its NEPA actions is unavailing. The fact that NMFS scientists were on

technical committees, provided comments along the way, disapproved measures in other regions, and took three years to publish a final rule, NMFS Mem. at 44-45, does not demonstrate that NMFS analyzed a reasonable range of alternatives in the Gulf of Maine. That has to be demonstrated by the record itself. *E.g., Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers,* 255 F. Supp. 3d 101, 122 (D.D.C. 2017), *citing United Techs. Corp. v. Dep't. of Defense*, 601 F.3d 557, 562 (D.C. Cir. 2010) (courts "do not defer to the agency's conclusory or unsupported suppositions").

### A.   NMFS Improperly Failed To Consider Reasonable Alternatives.

NMFS' scientists identified a number of areas of significant EFH importance as "complex habitat areas," EFH 7264, as adverse effects minimization HMAs, EFH 7267 (map), and as juvenile groundfish HMAs. EFH 7268 (map). Yet NMFS allowed a committee of the Council to summarily eliminate these reasonable and necessary alternatives from any NEPA review or further EFH analysis. NMFS provided no rationale for its failure to analyze these important alternatives beyond that proffered by the committee itself. This fact alone should lead to reversal on NEPA grounds. *See, e.g., Anglers Conservation Network v. Pritzker*, 139 F. Supp. 3d 102, 119 (D.D.C. 2015) (failure to consider relevant alternatives reversible NEPA error); *Yakima Valley Cablevision, Inc. v. FCC*, 794 F.2d 737, 746 n. 36 (D.C. Cir. 1986) ("failure of an agency to consider obvious alternatives has led uniformly to reversal").

Some alternatives were eliminated because the committee thought they were too large and wanted them "made smaller to allow for fishing opportunities. . . ." EFH 7264. Others were discarded from any NEPA or MSA analysis because "the [Council's] Committee preferred to work with refinements to areas already managed, as opposed to additional areas." *Id*. Others were discarded due to unspecified "extreme[] concern[s] about the potential economic impacts" in one case and "concerns about economic impacts" in the other. EFH 7265. Another proposed alternative to protect EFH in an ecologically critical inshore area was rejected because "the [Council's]

Committees determined not to recommend year round [HMA] designations in state waters as a general rule." *Id.* Another was abandoned without any reason. *Id.*

While these concerns may or may not ultimately have been meritorious after analysis, the committee just presumed the results of a NEPA analysis. NMFS points to no facts in the record or case law to support its capitulation to the NEPA judgments of a committee of an advisory body on the proper scope of NMFS' NEPA review. NMFS needed to "provide[] a reasoned explanation for why they could not or did not consider these alternatives, which clearly would 'bring about the ends of the federal action.' " *Flaherty,* 850 F. Supp. 2d at 71 (NMFS charged "in no uncertain times" with ensuring compliance with the law). Obvious and reasonable EFH alternatives that the agency's own science staff identified for the specific purposes of protecting juvenile fish habitat, protecting complex bottom EFH, and minimizing adverse fishing effects were improperly eliminated from NEPA review without a compelling justification.

### B.  NMFS Failed To Consider A Full Spectrum Of Alternatives.

NMFS argues that it followed this Circuit's "rule of reason" when it prepared its FEIS because it analyzed fifteen alternatives for the Eastern Gulf of Maine with a "variety of fishing restrictions." NMFS Mem. at 38-41. But simply counting the alternatives in the FEIS does not answer the core question of whether the agency limited itself to "only one end of the spectrum of possibilities," *Oceana,* 2005 WL 555416, at *34, or ignored an "obvious" alternative that would better achieve the MSA's goals. *Oceana, Inc. v. Evans,* 384 F. Supp. 2d 203, 244 (D.D.C.), *order clarified,* 389 F. Supp. 2d 4 (D.D.C. 2005).

NMFS' defenses of its NEPA decisions are unconvincing. First, it did not select alternatives that were designed to meet the statute's or the FMP's purposes. *See, e.g.,* EFH 55486, 55492 (maps showing areas of high fish persistence vis-a-vis analyzed alternatives). As set forth above, none of the alternatives selected were actually designed to minimize EFH impacts in a sub-

region so that the costs, benefits, and practicability of actually meeting the statutory purpose could be objectively analyzed. Instead, NMFS' selected NEPA alternatives were bounded by the Council's stated objectives of minimizing impacts to fishers or "improv[ing]. . . groundfish protections." NMFS Mem. at 40. That was precisely the NEPA defect in the *Am. Oceans Campaign* case: the Council's alternatives review was inadequate and NMFS did nothing to supplement the Council's lack of analysis with its own. *Id.,* 183 F. Supp. 2d at 20.

NMFS also appears to claim that the EFH protection alternatives it approved in other FMPs should count as being in the range of alternatives it examined in this FMP. NMFS Mem. at 40-41. It points to pre-existing "no action" spawning alternatives in the Gulf of Maine as proof that "past preferred alternatives that adopted expanded protections for EFH" should suffice for purposes of their NEPA alternatives range here. NMFS Mem. at 33. Other courts have rejected such arguments. *See Flaherty*, 850 F. Supp. 2d at 58-59. These are remarkable arguments on their own but all the more so because none of them actually informed the agency's Record of Decision. *See* Record of Decision (ECF 1-1) *passim.* They are, at best, *post hoc* rationalizations advanced for the first time in this case and not entitled to deference. *See, e.g,. Standing Rock Sioux,* 255 F. Supp. 3d at 122.

CLF does not argue that NMFS should have analyzed an "infinite number of combinations," NMFS Mem. at 41, or that any more "combinations" were required or that the use of the SASI model and technical analyses was not a rational means of determining the reasonable range of alternatives, *id.* at 38-39, or that size is all that matters. *Id.* at 42. Our position is that if the NMFS technical analysis produced alternatives that met the FMP's purposes or if there were alternatives that were significantly larger than the current closed areas that the scientists identified as having EFH value and vulnerability, NMFS should have analyzed those alternatives or

explained their basis for not doing so. The range analyzed needed to include a full spectrum of reasonable alternatives. CLF Mem. at 46, 50-53. Moreover, the alternatives and NMFS' discussion of alternatives needed to include an analysis of corals EFH protection, even if it was being considered separately. *See* 40 C.F.R. § 1508.25.

### C.   NMFS Did Not Minimize The Adverse Effects Of Fishing On Corals EFH.

Deep-sea corals -- habitat highly vulnerable to fishing gear because of high susceptibility and long recovery times of corals, EFH 39466 -- were identified in the Habitat Amendment as EFH for juvenile and adult redfish. *Id. See also* EFH 8343. The Council identified substrates supporting the growth of deep-sea corals as EFH for adult redfish as early as 2007, EFH 21394-21395, and the Council recommended this as part of the EFH text description in 2007. EFH 25095. NMFS approved the EFH text descriptions for redfish that included corals EFH. EFH 55725-55726. Neither the Council nor NMFS, however, undertook any NEPA analysis of alternatives to minimize the adverse effects of fishing on coral EFH in the Habitat Amendment despite the obligation to do so based on the purpose of the action. Instead, all coral EFH management measures were split off to a separate amendment where the agency promised the EFH minimization analysis would be undertaken after additional data and science were added to the record. *See* EFH 55730-55731. CLF agreed to this split based on its understanding that the EFH analysis would continue.

The agency then authorized a "bait-and-switch" maneuver by the Council where the separate corals amendment would *not* analyze coral EFH for section 303(a)(7) purposes but rather the review would be based exclusively on the Council's discretionary authority to propose coral protections under a different MSA authority. EFH 2410-2411. At the time NMFS issued its NEPA Record of Decision in January 2018, the agency already knew that there would be no further action involving corals EFH under section 303(a)(7) in New England. EFH 8917-8941. Yet it claimed falsely this work was happening: "[t]he deep sea coral amendment that the Council is currently

23

working on . . . will directly address EFH for redfish and other species." NMFS 2017 Approval Memorandum (ECF 1-2) at 24. NMFS' Record of Decision does not even mention corals EFH.

NMFS argues that CLF forfeited its right to raise these issues because it didn't object to the agency decision to undertake a separate corals action in 2012. NMFS Mem. at 46. CLF did not object in 2012 because the Council did have the discretionary authority to propose a separate action to protect deep-sea corals as corals, independent of analyzing corals as EFH, and the agency assured the public that the corals EFH work would continue alongside the discretionary action. CLF did not waive its claim that corals EFH had to be analyzed under section 303(a)(7) and there was no other final action CLF could have used to raise this issue.

Knowing that the Council had abandoned any work on corals EFH years before its final NEPA action on the Habitat Amendment, NMFS had an obligation in its final NEPA process to ensure that the amendment minimized--or at least considered--the adverse impacts of fishing on coral EFH to the extent practicable. Alternatively, NMFS needed to discuss how its section 303(a)(7) obligations relative to coral EFH were being fulfilled after the segmented corals EFH protection action was killed. *See* 40 C.F.R. § 1508.25. Taking the corals EFH issues out of this amendment without ensuring that concrete actions were being taken to address those issues in another action violates NEPA. *See Foundation on Economic Trends v. Heckler*, 756 F.2d 143, 158 (D.C. Cir. 1985) ("hard look" requirement violated when issue long sought by the public deferred to future amendment). NMFS had control of the Habitat Amendment EIS from June 2015 until its final decision in 2018. There is no reason for its failure to address the corals EFH protection issue when EFH work was terminated by the Council several years before NMFS' final action. Instead, not only did it not address that issue, NMFS' final NEPA decision and alternatives analysis disingenuously continues to assume, and to reassure to the public, that separate corals EFH activity

was on-going as the basis for not addressing that important issue from the Habitat Amendment. *E.g.,* ECF 1-2 at 24.

NMFS also argues that CLF's challenge to NMFS' failure to conduct an EFH corals analysis amounts to a claim of agency inaction not subject to challenge under NEPA and the APA. NFMS Mem. at 46-47. This argument is equally unpersuasive. CLF agrees that "NMFS was under no legal obligation to minimize the fishing impacts on corals generally in the Habitat Amendment, except to the extent they constitute EFH[.]" NMFS Mem. at 46. But that's the whole point: corals were and continue to be identified in the record as EFH for adult and juvenile redfish, EFH 39466, 8343, and the adverse effects of fishing on that EFH were not analyzed in the Habitat Amendment or elsewhere. NMFS Mem. at 50.

## CONCLUSION

The Court should issue an Order declaring that NMFS' approval of the Habitat Amendment violated the MSA, NEPA and the APA, partially vacating the Gulf of Maine portions of that action, directing NMFS to reinstate prior protections, and revoking any area access authorizations based on the Habitat Amendment. CLF agrees with NMFS that further briefing on remedy would be valuable if the Court finds for CLF.

Respectfully submitted this 10th day of January 2019.

/s/ Erica A. Fuller
ERICA A. FULLER
D.C. Bar No. MA0001
PETER SHELLEY
Mass BBO No. 544334
Admitted *Pro Hac Vice*
CONSERVATION LAW FOUNDATION
62 Summer St.
Boston, MA 02110
(617) 850-1727 Telephone
efuller@clf.org
pshelley@clf.org
*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 10, 2019, I caused the foregoing to be filed and served upon counsel of record via the Court's CM/ECF filing system, which will send notice of such to all counsel of record.


/s/ Erica A. Fuller
Erica A. Fuller

26