**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **CONSERVATION LAW FOUNDATION,** | |
| **Plaintiff,** | |
| v. | Civil Action No. 18-1105 (JEB) |
| **WILBUR ROSS, in his official capacity as Secretary of the United States Department of Commerce, *et al.*,** | |
| **Defendants.** | |

## MEMORANDUM OPINION

When it comes to our nation's critical ocean habitat, Plaintiff Conservation Law Foundation says that the federal government has one job: protect it. So when the National Marine Fisheries Service, an agency under the auspices of the Secretary of Commerce, approved a new management plan for the Gulf of Maine that opened up a broad swath of ocean to the commercial and recreational fishing fleet, CLF was understandably concerned. Hoping to reel in the damage, Plaintiff seeks this Court's intervention. CLF's primary contention is that the Agency ran aground when it failed to sufficiently prioritize conservation measures over economic considerations. The judicial role in evaluating such agency action, however, is limited. While the Court carefully reviews the record to ensure that the Service has sufficiently articulated a rational line based on relevant factors between its factual findings and final conclusions, its function does not extend further. Policymaking is not in the Court's wheelhouse. Finding that the Government satisfied its obligations, the Court will deny Plaintiff's Motion for Summary Judgment and grant Defendants' Cross-Motion.

# I.    Background

The saga underlying this suit is decades in the making.  At its heart lies the Service's modification of management plans that govern fisheries in waters seaward of New England.  Within one geographic area — the Gulf of Maine — this amendment opened to fishing an ocean corridor that was previously off limits.  The series of steps that ultimately spawned this decision is intertwined with one statute's operation: the Magnuson-Stevens Fishery Conservation and Management Act, commonly known as just the Magnuson-Stevens Act or MSA.  To provide the necessary context, the Court will thus begin with a brief exposition of this legal scheme.  With the stage set, it will then provide an overview of the history that led us here.  (On a logistical note, the Court, following the lead of the parties and the format of the appendix, will introduce appendix cites with the acronym "EFH," which stands for essential fish habitat.)

## A.  Statutory Framework

Congress passed the MSA to address the persistent problem of overfishing in U.S. waters.  See Conservation Law Found. v. Pritzker, 37 F. Supp. 3d 234, 239 (D.D.C. 2014).  This legislative elixir prescribes a balance between the "twin goals of conserving our nation's aquatic resources and allowing U.S. fisheries to survive."  Oceana, Inc. v. Pritzker, 26 F. Supp. 3d 33, 36 (D.D.C. 2014); see also NRDC v. Nat'l Marine Fisheries Serv., 71 F. Supp. 3d 35, 37–38 (D.D.C. 2014) (stating similarly).  The Act assigns the Secretary of Commerce this responsibility, who has in turn delegated the responsibility to the Service, a division of the National Oceanic and Atmospheric Administration.  Oceana, 26 F. Supp. 3d at 36; see also 16 U.S.C. § 1852(a), (h).

Fisheries management is no simple task.  To aid in this "exceedingly complex" undertaking, see Oceana, Inc. v. Evans, 384 F. Supp. 2d 203, 241–42 (D.D.C. 2005), the Act

establishes eight regional Fishery Management Councils, each of which monitors and oversees certain fisheries under its control. See 16 U.S.C. § 1852(a), (h). The makeup of each Council's voting membership is designed to account for the views of a variety of stakeholders with relevant expertise. On each board sits a state official from the region with "marine fishery management responsibility and expertise," the regional director of the Service (or her designee), and individuals appointed by the Secretary of Commerce who are knowledgeable regarding either the "conservation and management . . . of the fishery resources of the geographical area concerned" or the "commercial or recreational harvest" of those fisheries. Id. § 1852(b)(1)–(2). For the purpose of this action, the New England Fishery Management Council is the relevant body. This Council oversees fisheries in the Atlantic Ocean seaward of states from Maine to Connecticut. Id. § 1852(a)(1)(A). To assist each Council in carrying out its responsibilities, the MSA provides in turn for the creation of standing committees of scientists and fishing-industry experts that report periodically on the status and health of fish stocks in each fishery, peer-review new scientific methods for fishery conservation and management, and advise the Council throughout its functions. Id. §§ 1852(g)(1); 1852(g)(3)(A); 1852(i)(5). The Service and the Council, assisted by its standing committees, together act to address imbalances in aquatic ecosystems.

Central to this role — as well as to this case — is the creation of Fishery Management Plans. Each Council must develop and maintain such a plan for each fishery under its control. Id. § 1852(a). Fisheries, as defined by the Act, are either "one or more stocks of fish which can be treated as a unit for purposes of conservation and management" or "any fishing for such stocks." Id. § 1802(13). Stocks, in turn, can be a species or subspecies of fish. Id. § 1802(42). A single FMP thus often governs the management of multiple species of fish. Once developed

and implemented, plans can be updated by amendments, which "alter Plans in broad strokes." Conservation Law Found., 37 F. Supp. 3d at 239 (internal citation omitted).

The Council's FMPs and amendments must follow multiple prescriptions. First, they must be in compliance with ten "national standards for fishery management" established by the MSA, see 16 U.S.C. § 1851(a), which set forth a range of broad and sometimes-competing objectives. See Oceana, Inc. v. Pritzker, 24 F. Supp. 3d 49, 68 (D.D.C. 2014). Second, plans must contain certain "[r]equired provisions." 16 U.S.C. § 1853(a). Many of these provisions ask for specific information — for example, "the number of vessels involved" with the relevant fishery, id. § 1853(a)(2) — while others set directives more akin to the national standards. See, e.g., id. § 1853(a)(1)(A) (requiring that FMPs contain measures "necessary and appropriate for the conservation and management of the fishery"). Finally, the Act provides a suite of "[d]iscretionary provisions" that the Council "may" include. Id. § 1853(b).

Once prepared, each Council submits proposed FMPs or subsequent amendments to the Service. The Service's role at this stage is confined largely to determining whether the proposed plan or amendment complies with applicable law, rather than developing its own preferred measures. It thus acts on behalf of the Secretary of Commerce to "approve, disapprove, or partially approve" the plan or amendment. See 16 U.S.C. § 1854(a)(3). In determining whether or not to approve an FMP, the Service must review it for consistency with the requirements of the MSA, including the national standards and content requirements found at §§ 1851(a) and 1853(a), and, following a 60–day public-notice-and-comment period, "take into account the information, views, and comments received from interested persons." 16 U.S.C. § 1854(a)(1)– (2). If, upon completing this review, the Agency determines that a plan complies with applicable law and thus approves the FMP or amendment, a final rule and one or more implementing

regulations are published in the Federal Register. Id. § 1854(b)(3). Approved FMPs and amendments are subject to judicial review under the Administrative Procedure Act if challenged within 30 days of the regulation's promulgation. Id. § 1855(f)(1).

If, however, the Agency concludes that an FMP or amendment fails to comply with applicable law, it does not simply revise the management measures as it desires, but rather sends it back to Council. In doing so, it must notify the Council of "the applicable law with which the plan or amendment is inconsistent" and the "nature of such inconsistencies," as well as any "recommendations" on measures the Council could take "to conform such plan or amendment to the requirements of applicable law." Id. § 1854(a)(3). Only if the Council fails to return a revised plan is the Service empowered to develop an FMP or amendment itself. Id. § 1854(c)(1)(B); see also Anglers Conservation Network v. Pritzker, 70 F. Supp. 3d 427, 431 (D.D.C. 2014).

Finally, in addition to these requirements of the MSA, any plan or amendment must also conform to the procedural mandates of the National Environmental Policy Act (NEPA). Because the contours of that Act are not necessary to understand the administrative process here, the Court saves a rehearsal of its specifics for a later discussion.

B. Factual Background

The Court begins by casting its net back to 1996, when Congress passed an amendment to the MSA that expanded the Act's scope by emphasizing the creation of conservation measures aimed at protecting fish habitat. See Sustainable Fisheries Act, Pub. L. No. 104-297, § 108, 110 Stat. 3559. Preserving the health of habitats, the thinking goes, is key to ensuring productive, and thus sustainable, fish populations. See EFH 7863–64; see also 69 Fed. Reg. 8367 (Feb. 24, 2004) (summarizing amendment). To comply with this directive, the New England Regional

Council (the only council at issue here, thus permitting the Court to refer to it simply as "the Council") initiated an omnibus amendment that attempted to bring each FMP into compliance. See 63 Fed. Reg. 9500 (Feb. 25, 1998). The original amendment's tenure, however, was short lived. In 2000, a court held that its development failed to abide by the procedural requirements set forth in NEPA and enjoined its operation. See Am. Oceans Campaign v. Daley, 183 F. Supp. 2d 1, 19–21 (D.D.C. 2000). The Council went back to the drawing board.

After making changes responsive to that court's order, the Council embarked on a second omnibus amendment in 2004 with the purpose of developing a comprehensive approach to essential-fish-habitat management. See 69 Fed. Reg. at 8368; see also ECF No. 25, Attach. 1 (Def. Opp. & Mot.) at 4–5. More specifically, this process sought to update the "EFH components" of each of the seven fishery-management plans under the Council's purview. See 69 Fed. Reg. at 8367. These plans account for the management of 28 species of fish and their respective habitats within the seven fisheries. See EFH 7795–7803. Generally speaking, the Service operationalizes its habitat-protection aims by creating geographically bounded "habitat management areas" (HMAs) or "habitat closures," within which it places restrictions on types of fishing. See, e.g., 50 C.F.R. § 648.370. This effort eventually yielded the omnibus amendment challenged here, which the Court will refer to as the Habitat Amendment. (Given that this is the second such endeavor, this Amendment also appears in the record and briefs as the Omnibus Habitat Amendment 2 and OHA2.)

The scope of this project ebbed and flowed over its lengthy course. Early in the Council's process, it opted to expand the Amendment's purpose to include the consideration of measures aimed at mitigating the impact of fishing on deep-sea corals — a discretionary task under the MSA, see 16 U.S.C. § 1853(b)(2) — but later opted to relegate this task to a stand-

alone amendment process.  See 83 Fed. Reg. 15240, 15245 (Apr. 9, 2018).  The segregation of corals is one decision CLF challenges here.

Then, in 2012, the Council added to the Amendment's scope goals specific to one of its managed fisheries.  The Northeast multispecies fishery, which is alternatively called the groundfish fishery, consists of 13 species divided into 20 stocks and includes, for example, fish ranging from Atlantic cod and halibut to windowpane flounder, ocean pout, and Atlantic wolffish.  See EFH 7849–50; Oceana, Inc. v. Locke, 831 F. Supp. 2d 95, 102 (D.D.C. 2011).  As part of this fishery's management plan, the Service closed certain areas to fishing gear capable of catching groundfish.  See 76 Fed. Reg. 35408 (June 17, 2011).  These "groundfish closures" thus serve to protect a segment of the fish stock by limiting its exposure to fishers.  See Conservation Law Found., 37 F. Supp. 3d at 240.  Given the spatial overlap between existing groundfish closures and proposed new or modified habitat closures, the Council decided to consider revisions to both categories in conjunction.  See 76 Fed. Reg. at 35408.  Unlike its deep-sea-corals addition, this one stuck.

To implement its habitat- and groundfish-protection goals, the Council employed a complex and multi-step process, which relied on multiple expert committees.  The Court presents a somewhat simplified version of events here.  In its initial phase, the Council first identified or updated the ocean habitat essential to the species of fish within its purview.  See 76 Fed. Reg. at 35408.  Next, it worked to ascertain the areas within that habitat most vulnerable to harm from fishing gear.  Id.  To aid in this endeavor, it used a new model, dubbed the Swept Area Seabed Impact or SASI.  See EFH 7524.  This model churned out data that permitted the Council to understand which areas would benefit most from certain restrictions on fishing gear.  Id.; see also EFH 6332.  Relying on the groundfish objectives, the Council also turned to survey data to

identify areas most important to those fish stocks, which it deemed "groundfish hotspots." EFH 6332; see also EFH 8096–98. Using input from both sources, the Council developed new and modified closure areas. See EFH 6332; EFH 41204; 83 Fed. Reg. at 15250. It then crafted various alternative fishing-management measures, consisting of combinations of different areas subject to protection and various levels of fishing restrictions within those areas. See EFH 6201–07. After taking into consideration the conservation value and economic impact of these restrictions in both the short and long term, the Council announced its recommendations.

The results in the Gulf of Maine are a mixed catch from the pure-conservation standpoint adopted by CLF. The Gulf is broken down into three sub-regions. In the Eastern Gulf of Maine, the proposed Amendment closed grounds that were previously open to all mobile bottom-tending gear. See EFH 6207, 6218. The region ultimately closed, however, is smaller than other alternatives considered by the Council. Id. In the Central Gulf of Maine, the Council largely left intact the existing boundaries of regulated waters, making minor modifications. See EFH 6222. It is in the Western Gulf of Maine that CLF directs most of its fire. There, the Council opted to redraw the eastern boundary of the largest closure so that a few hundred square nautical miles previously closed to fishing became accessible, which amounts to about a 25% reduction in protected area in that sub-region. See EFH 6241; 83 Fed. Reg. at 15246. On net, after accounting for both the closures and opening of grounds to fishing, the Amendment decreased the size of geographic fishing closures relative to the status quo. See ECF No. 25, Attach. 1 (Pl. Mot.) at 3.

With the Council's task complete, and following the statutorily prescribed route to approval, the Habitat Amendment moved upstream to the Service. As required by law, the Agency immediately put out the proposed Amendment in the Federal Register for comment. See

82 Fed. Reg. at 46750.  After reviewing the comments and analyzing the Amendment for its consistency with applicable statutes, the Service approved the portions of the Amendment that managed fisheries in the Gulf of Maine.  See ECF No. 1 (Compl.), Attach. 1 (Record of Decision) at 2.  Unrelated to this action, it disapproved two portions of the Amendment in the other areas within the Council's jurisdiction.  Id.  It then promulgated a final rule putting the approved portions of the Amendment into effect.  See 83 Fed. Reg. at 15240.

CLF takes issue with this final approval.  It believes that the Service's endorsement of the measures in the Gulf of Maine amounts to a dereliction of its conservation duties.  Specifically, Plaintiff thinks that the Agency was wrong to conclude that the measures adopted comply with the MSA's directive to protect essential fish habitat.  It also believes that the range of alternatives analyzed by the Council falls short of NEPA's procedural demands.  Both parties have now filed Motions for Summary Judgment and presented the Court with a voluminous administrative record.  Having reviewed this record, the Court is primed to make its decision.

## II.    Legal Standard

Challenges under both the MSA and NEPA proceed under the Administrative Procedure Act's familiar "arbitrary and capricious" standard of review.  See 16 U.S.C. § 1855(f)(1); 5 U.S.C. § 706(2)(A).  Because of the limited role federal courts play in reviewing such administrative decisions, the typical Federal Rule 56 summary-judgment standard does not apply to the parties' dueling Motions.  See Sierra Club v. Mainella, 459 F. Supp. 2d 76, 89-90 (D.D.C. 2006).  Instead, in APA and MSA cases, "the function of the district court is to determine whether or not . . . the evidence in the administrative record permitted the agency to make the decision it did."  Id. (internal citations omitted).  Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether an agency action is supported by the

administrative record and is otherwise consistent with the APA standard of review. See Bloch v. Powell, 227 F. Supp. 2d 25, 31 (D.D.C. 2002) (citing Richards v. INS, 554 F.2d 1173, 1177 (D.C. Cir. 1977)).

The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Under this "narrow" standard of review — which appropriately encourages courts to defer to the agency's expertise, see Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) — an agency is required to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." Id. (internal quotation marks omitted). In other words, courts "have held it an abuse of discretion for [an agency] to act if there is no evidence to support the decision or if the decision was based on an improper understanding of the law." Kazarian v. U.S. Citizenship and Immigration Services, 596 F.3d 1115, 1118 (9th Cir. 2010). Put another way, the Court's role is only to "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Am. Oceans Campaign, 183 F. Supp. 2d at 4 (quoting Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971)).

It is not enough, then, that the court would have come to a different conclusion from the agency. See Oceana, 24 F. Supp. 3d at 58 (citing Steel Mfrs. Ass'n v. EPA, 27 F.3d 642, 646 (D.C. Cir. 1994). The reviewing court "does not substitute its own judgment for that of the agency," id., nor does it "disturb the decision of an agency that has examine[d] the relevant data and articulate[d] . . . a rational connection between the facts found and the choice made." Ams. for Safe Access v. DEA, 706 F.3d 438, 449 (D.C. Cir. 2013) (internal quotation marks and

citation omitted).  A decision that is not fully explained, moreover, may be upheld "if the agency's path may reasonably be discerned."  Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 286 (1974).  It is only these "certain minimal standards of rationality" to which a reviewing court holds an agency.  See Nat'l Envtl. Dev. Ass'n's Clean Air Project v. EPA, 686 F.3d 803, 810 (D.C. Cir. 2012) (citing Ethyl Corp. v. EPA, 541 F.2d 1, 36–37 (D.C. Cir. 1976) (en banc)).

In cases involving expert scientific judgment, courts employ a particularly high level of deference.  When examining an agency's "predictions, within its area of special expertise, at the frontiers of science," the "reviewing court must generally be at its most deferential."  Balt. Gas & Elec. Co. v. NRDC, Inc., 462 U.S. 87, 103 (1983).  In addition, courts pay agencies "an extreme degree of deference" when decisions "involve complex judgments about sampling methodology and data analysis that are within the agency's technical expertise."  Kennecott Greens Creek Mining Co. v. Mine Safety & Health Admin., 476 F.3d 946, 956 (D.C. Cir. 2007) (internal quotation marks and alterations omitted); see also Int'l Bhd. of Teamsters v. U.S. Dept. of Transp., 724 F.3d 206, 216 (D.C. Cir. 2013) ("[I]n light of the degree of deference we give to the agency's statistical methodology, we cannot conclude that the program will yield invalid findings.").  In other words, when an agency talks scientific data, courts listen.  As long as the ultimate decision is reasonable and reasonably explained, that decision will stand.

## III.  Analysis

At bottom, this case is about whether the Council went overboard in weighing economic objectives against conservation goals.  Two federal statutes — the MSA and NEPA — serve as the bedrock of Plaintiff's challenge, although the APA provides the avenue for judicial review.

See ECF No. 17 (Am. Compl.), ¶¶ 69–129; 16 U.S.C. § 1855(f)(1).  The Court starts with the MSA issues and ends with a shorter analysis of those under NEPA.

A.  MSA Claim

As noted, the Court embarks on its journey with Plaintiff's MSA claim.  Getting a handle on this Act, however, is no mere day sail.  A fair amount of rigging therefore precedes the full airing of CLF's challenge.

1.  *Threshold Issues*

In order to set up the analytical framework that guides its inquiry, the Court first wades into the parties' disagreement about what restrictions the statute — or, more precisely, one provision of the statute — places on the Agency's actions in developing conservation measures. It next offers a few words about the nature of judicial review of an agency decision rendered subject to this standard.

a.  Meaning of MSA's EFH Provision

As explained earlier, amendments to FMPs must comply with a plethora of statutory requirements.  One such provision plays a starring role here.  Unlike other requirements, which target the commercial and recreational catching of fish directly, this one aims at protecting the critical habitat of each managed species of fish.  Id. § 1853(a)(7).  The Council must first identify these "essential fish habitats" (EFH), which the MSA defines as the "waters and substrate necessary to fish for spawning, breeding, feeding or growth to maturity."  Id. § 1802(10). Crucially for this case, once these habitats are identified, FMPs must "minimize to the extent practicable adverse effects on such habitat caused by fishing."  Id. § 1853(a)(7).  (For ease of reference, the Court will refer to this statutory language as the "EFH provision.")  Complying with this latter mandate was the Council's core objective in initiating the Habitat Amendment.

See 76 Fed. Reg. at 35408–09. CLF's contention is that it fell short. Much turns, therefore, on the precise meaning of this command. It is with this issue of statutory interpretation that the Court thus starts.

Agreement evident in the parties' briefs sets the bounds of this dispute. They are notably on the same page that the "practicable" language permits, or perhaps even requires, the Council to weigh social and economic harms to fishers against any conservation value. See Pl. Mot. at 27; Def. Opp. & Mot. at 16; see also Pl. Opp. & Reply at 3 ("'Practicable' implicitly requires that NMFS not focus on the EFH ecological benefits exclusively but must also weigh them against socio-economic factors."). The parties also agree that the Council must harmonize the ten national standards in any action, which requires it to balance multiple objectives. See Pl. Mot. at 27; Pl. Opp. & Reply at 3; Def. Opp. & Mot. at 17. Where they disagree, however, is in the relative priority assigned to these goals.

CLF contends that, as a categorical matter, conservation objectives take priority over economic considerations. See Pl. Mot. at 28, 30. This interpretation, it says, follows from the "plain meaning" of the statute. Id. at 27. Only when two proposed actions have similar conservation goals can the Council turn to economic considerations. Id. at 28, 30. And even then, only an "extreme economic hardship" justifies diverging from a more conservation-friendly alternative. See Pl. Opp. & Reply at 6, 8.

Not quite, retorts the Service. It sees the balancing as more flexible. Under its approach, the Council is entrusted with "conduct[ing] a thorough consideration of complex factors representing a broad array of interests with the goal of achieving the greatest benefit to the nation from each managed fishery." Def. Opp. & Mot. at 21. Unlike CLF, the Service does not think that the Council is required to "prioritize alternatives based solely on conservation value." Id. at

22.  It goes so far as to say that "[n]othing . . . require[s] the Council, where there were multiple alternatives for each sub-region that were potentially practicable, to choose the one with the highest conservation value."  ECF No. 32 (Def. Reply) at 8.  Herein lies the rub.

The Government's view advanced in its brief, however, is only a litigation position. Although the Service has promulgated a regulation that expands on the meaning of the statutory provision at issue, see 50 C.F.R. § 600.815(a)(2)(ii)–(iii), that regulation does not answer directly the operative issue here: the statute's relative weighing of conservation and economic considerations.  Lacking any on-point agency interpretation capable of warranting Chevron deference, the Court's statutory interpretation here proceeds *de novo*.  See Menkes v. U.S. Dep't of Homeland Sec., 637 F.3d 319, 345 (D.C. Cir. 2011) (noting that "Chevron deference . . . does not apply to an agency's litigation position").

The Court nonetheless largely agrees with the Government that the statutory scheme does not impose the rigid prioritization urged by Plaintiff.  Although it understands why reading the requirement to "minimize . . . the adverse effects of fishing" in a vacuum would yield CLF's interpretation, resort to the full statute dispels this hierarchy.  That is because, as the parties acknowledge, in any FMP or amendment to an FMP, this is not the only requirement with which a Council must comply.  The ten national standards also compete for attention, many of which are similar in structure to the provision at issue here.  Three, for instance, command the Council to "minimize" something.  See 16 U.S.C. § 1851(a)(7)–(9).  Six of the ten impose some sort of requirement "to the degree practicable" or "where practicable."  Id. § 1851(a)(3), (5), (7)–(10). To comply with the national standards and the requirement here, therefore, an FMP — to the degree or where "practicable" — must "minimize" all of the following: the adverse effects of fishing on habitat, the economic impacts on fishing communities, costs and duplication, and

bycatch and the mortality of bycatch. It must also, "where practicable, consider efficiency in the utilization of fishery resources," although the MSA cautions that "no such measure shall have economic allocation as its sole purpose." Id. § 1851(a)(5). This is not the first court in this district to recognize that several of these statutory goals stand in some tension. See Oceana, 24 F. Supp. 3d at 68 (noting "somewhat conflicting nature" of national standards and stating that they "require the agency to balance several competing considerations in developing FMPs").

The upshot of this statutory structure is that Congress did not intend any of these specified goals — i.e., the ones limited to actions that are "practicable" — to take priority over the others. That includes CLF's focus on the habitat-conservation goal. Rather, the legislature wrote the essential-fish-habitat provision "to allow for the application of agency expertise and discretion in determining how best to manage fishery resources." Conservation Law Found., 37 F. Supp. 3d at 251 (citing Conservation Law Found. v. Evans, 360 F.3d 21, 28 (1st Cir. 2004)); see also Oceana, Inc. v. Evans, 2005 WL 555416, at *35 (D.D.C. Mar. 9 2005) (same); Oceana, 384 F. Supp. 2d at 242 (same). The provision does not "require Councils to do everything they can to protect essential fish habitat." Conservation Law Found., 37 F. Supp. 3d at 251. To borrow an apt description from another court, a "singular focus on alternatives that close fishing grounds in order to protect EFH ignores [the MSA's] statutory mandates and effectively reads 'practicable' out of the MSA." Oceana, 2005 WL 555416, at *35. Congress's inclusion of the term "practicable" is thus critical; it is the means by which it "delegated to the agency the discretion to weigh the relevant factors" embodied in the MSA's competing objectives. Oceana, 24 F. Supp. 3d at 67. The Council is no doubt required to consider the impact of fishing on essential habitat. It need not, however, exalt this objective over all others.

As CLF points out, there is language in one D.C. Circuit opinion that appears to suggest otherwise. In NRDC, the circuit stated that "the Service must give priority to conservation measures" and that "[i]t is only when two different plans achieve similar conservation measures that the Service takes into consideration adverse economic impacts." NRDC, Inc. v. Daley, 209 F.3d 747, 753 (D.C. Cir. 2000). Those statements, however, must be understood in context. In NRDC, the court considered the interplay of two national standards regarding a plan's proposed imposition of a catch limit on certain species of fish. National standard one provides that the Agency "shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery." 16 U.S.C. § 1851(a)(1). In setting catch limits to implement this conservation goal, the Service — consistent with national standard eight — must also, "to the extent practicable, minimize adverse economic impacts on [fishing] communities." Id. § 1851(a)(8). At issue in NRDC was whether there was a conflict between these two directives. See 209 F.3d at 753; see also 16 U.S.C. § 1851(a)(1), (8). The language in the circuit's holding quoted above was its answer to this question — i.e., because conservation measures take priority, there is no tension.

A glance at the statute's language confirms the logic of that court's view in this context. National standard one is an unqualified directive: the Service "shall prevent overfishing while achieving . . . optimum yield." 16 U.S.C. § 1851(a)(1). National standard eight, conversely, is qualified both by its introductory verb — "minimize," instead of "prevent" — and the limitation to only further this goal "to the extent practicable." Id. § 1851(a)(8). Given this language, it makes perfect sense that the conservation goal embodied by the directive to prevent overfishing be given priority over the goal of minimizing adverse impacts.

Unlike NRDC, the challenge in this case is not to the Service's prescribed catch limits that attempt to "maximize the harvest of a single class of fish over its entire life span" — *i.e.*, achieve optimum yield.  See NRDC, 209 F.3d at 749.  At issue here, rather, is another type of conservation measure: habitat protection.  CLF invites this Court to extend the circuit's holding in NRDC from the overfishing context to habitat-protection measures.  See Pl. Mot. at 28.

The Court declines the invitation to read such a hierarchy into the Act's essential-fish-habitat provision.  Applying the logic underlying NRDC to statutory text here proves central to this conclusion.  Unlike the directive to "prevent overfishing," the EFH provision is qualified by both its verb ("minimize") and the limitation to actions that are "practicable."  The structure of this mandate is thus functionally identical to much of national standard eight, which is the precise provision that the court in NRDC held was subordinate to a more explicit directive.  For many of the reasons already explained, the inclusion of the word "practicable" is "crucial." Conservation Law Found., 37 F. Supp. 3d at 251.  So while the potential tension in NRDC lay between an explicit directive and an effort to "minimize" something to the extent "practicable," that is not the case here.  Rather, the weighing of competing objectives lies within an objective to "minimize to the extent practicable."  This language grants the Service broad discretion to weigh relevant factors, rather than imposing any rigid hierarchy among them.  NRDC's statement limiting any consideration of economic impacts to situations in which "two different plans achieve similar conservation measures," 209 F.3d at 753, simply does not make sense in the context of the EFH provision.

To be sure, CLF appears to retreat from this position in its Reply brief.  It contends that the Council need not adopt any restriction that imposes an "extreme economic hardship."  Pl. Opp. & Reply at 6, 8, 14.  But whence CLF finds this limit is unclear.  The language does not

exist in the statute or in any of the regulations governing EFH. And, absent a hook in the law, this Court sees no reason to adopt it in place of the more flexible balancing that flows from the statutory structure.

Finally, before moving on, the Court notes that its conclusion here also does away with another variant of CLF's challenge. Plaintiff asserts throughout its briefs that the Council and the Service both misunderstood the MSA's requirements. It contends that both the formal goals and objectives created by the Council to guide its action, as well as several statements sprinkled throughout the record, demonstrate this misunderstanding. See, e.g., Pl. Mot. at 30–32; Pl. Opp. & Reply at 5. Certainly, if that were true, it could be grounds to condemn the Service's Amendment: an agency's decision "based on an improper understanding of the law" can render it arbitrary or capricious. See Kazarian, 596 F.3d at 1118. But that is not what happened here. Rather, as the prior discussion shows, it appears that CLF is the party unclear on the MSA's directive. Because Plaintiff's contention here rests primarily on a view of the law with which the Court disagrees, its conclusion falls too. The Court has analyzed the Council's goals and objectives — some of which explicitly relate to the Amendment's groundfish, rather than habitat-protection purposes, see 82 Fed. Reg. at 46750 — as well as the other record statements to which Plaintiff points. It has little trouble concluding that these statements are consistent with the MSA, as interpreted above.

b. Nature of Judicial Review

The preceding section mapped the contours of the MSA's directive to protect essential habitat. With that task complete, the Court's exercise in statutory interpretation also concludes; what remains is governed by arbitrary-or-capricious review. See Judulang v. Holder, 565 U.S. 42, 53 n.7 (2011) (noting that "arbitrary or capricious review under the APA," rather that

Chevron, is "the more apt analytical framework" when agency's decision "is not an interpretation of any statutory language"). That is because CLF's extant challenges to the Amendment concern the manner in which the Service implemented an established, but inherently discretionary, directive. This sort of dispute is "a garden variety APA arbitrary and capricious claim, and [the Court] should treat it as such." Chamber of Commerce of U.S. v. FEC, 76 F.3d 1234, 1235–36 (D.C. Cir. 1996). For this reason, the "vast majority" of courts in this district have analyzed these kinds of challenges to fishery-management plans under that standard, although a few have employed Chevron. See NRDC, 71 F. Supp. 3d at 64; see also id. at n.16 (noting "some ambiguity regarding the proper standard of review with respect to claims of this nature").

However interesting this issue of administrative law, it ultimately matters little to the nuts and bolts of this Court's analysis. That is because, as this circuit has repeatedly pointed out, there is often much "overlap" between the second step of Chevron and arbitrary-or-capricious review. See, e.g., Pharm. Research & Mfrs. of Am. v. FTC, 790 F.3d 198, 204 (D.C. Cir. 2015); Animal Legal Def. Fund, Inc. v. Glickman, 204 F.3d 229, 234 (D.C. Cir. 2000); Arent, 70 F.3d at 616. That point aside, recognizing virtue in some legal formality, the Court uses the case law building out the arbitrary-or-capricious standard of review as its guiding light.

Starting with the basics, it is the "actions of the NFMS in promulgating regulations to adopt a Fishery Management Plan [that] are subject to judicial review," rather than the actions of the Council directly. See NRDC, 71 F. Supp. 3d at 43 (citing N.C. Fisheries Ass'n v. Gutierrez, 550 F.3d 16, 17 (D.C. Cir. 2008)). The Service's role here, as explained above, is to determine whether the Council's proposed plan complies with applicable law. But the Court does not review the Service's conclusion de novo. See Blue Ocean Inst. v. Gutierrez, 585 F. Supp. 2d 36,

43 (D.D.C. 2008).  Rather, the "court's 'task is . . . to determine whether the Secretary's conclusion that the standards have been satisfied is rational and supported by the record.'"  Id. at 41 (quoting C&W Fish Co. v. Fox, Jr., 931 F.2d 1556, 1562 (D.C. Cir. 1991)).

Finally, in its Reply brief, CLF asserts that the Court should not grant any deference to the Council or "sanction NFMS' deference" to that body.  See Pl. Opp. & Reply at 14.  Because Plaintiff's explanation of this contention is brief, the Court struggles to discern the precise argument it is trying to make.  If CLF is attempting to argue that no Chevron deference is due to the Council following the Supreme Court's decision in Mead, 533 U.S. at 231–32 — an argument at least one student commentator has made, see Kate Stanford, Note, The Need for Chevron Step Zero in Judicial Review of Interpretations Developed by Fishery Management Councils, 19 N.Y.U. Envtl. L.J. 380 (2012) — that line of reasoning finds no success here.  As the earlier analysis makes clear, it is the APA's arbitrary-or-capricious review, not Chevron, that applies.  If Plaintiff instead means to assert that some standard other than arbitrary and capricious governs this review of agency action, then it needs to supply more than a passing reference to do away with this pillar of administrative law.

Alternatively, perhaps CLF means to argue that the Court should look only to the Record of Decision (ROD) and implementing regulatory language to locate the Service's rationale, instead of crediting anything in the Final Environmental Impact Statement (FEIS).  The rationale here might be that, while the ROD (and likely the text in the Federal Register) originates with the Service, the FEIS is "[p]repared by the . . . Council."  EFH 5780.  This too founders.  For one, the FEIS is not prepared by the Council alone, but "[i]n cooperation with the . . . Service."  Id. Second, the statutory scheme sets out a division of labor that grants a significant role to the Council.  The statute does not require the Service to make its own factual findings about fish

habitat and the impacts of management measures. In fact, it is only under narrow circumstances that the Agency even develops its own management measures. See Anglers Conservation Network, 70 F. Supp. 3d at 431. The Court sees little reason why it should grant the Council any less leeway to exercise its expertise than it would another body housed within an administrative agency. Finally, even if an agency does not fully explain its decision, it is nevertheless upheld "if the agency's path may be reasonably discerned." Bowman Transp., Inc., 419 U.S. at 286. The FEIS — a document the Service's Record of Decision explicitly incorporates, see Record of Decision at 1 — is the place where that path would be most evident. Whatever it may be, Plaintiff's argument against deference finds little refuge here. And with that, loyal readers, the Court may weigh anchor.

## 2. Gulf-of-Maine Protection Measures

CLF's discontent with the Service's approval of the Habitat Amendment in the Gulf of Maine is geographically comprehensive: it raises challenges to the level of habitat protection in all three sub-regions. The Court will sail through each in order, moving from east to west.

### a. Eastern Gulf of Maine

Setting out, the Court first encounters Plaintiff's challenge to the Eastern Gulf of Maine measures. The Habitat Amendment establishes a single protected area within this region, which it closed to all mobile bottom-tending gear. See 83 Fed. Reg. at 15241. Dubbed the "Small Eastern Maine Habitat Management Area," this 529-square-kilometer region covers a roughly rectangular shape extending from points south of Mount Desert Island to Isle Au Haut. See EFH 6211–12. The Service approved this measure because it "achieves a notable level of protection for vulnerable habitat without significant economic impacts." 83 Fed. Reg. at 15260. Plaintiff believes that the Amendment should have protected more.

Prior to this Amendment, no habitat in the Eastern Gulf of Maine garnered any protection at all from fishing. To draw up potential geographic areas for fishing restrictions, the Council employed its SASI model and other survey data. This process yielded four possible habitat-management areas, which are represented in Figure 1: Machias HMA, Large Eastern Maine HMA, Small Eastern Maine HMA, and the Toothaker Ridge HMA. See EFH 6207. Notably, Small Eastern Maine is contained wholly within Large Eastern Maine. For purpose of analysis, the Council then combined various permutations of these areas into three alternatives. Alternative 1 left things as they were at the time of the Amendment — *i.e.*, no habitat in the Eastern Gulf of Maine would receive any protection. Id. The second alternative proposed protection of the Machias and Large Eastern Maine HMAs. Id. Alternative 3, finally, combined the Machias, Small Eastern Maine, and Toothaker Ridge regions for protection. Id. For each alternative, the Council also considered a range of fishing restrictions. Plaintiff, however, makes little argument about the specific restrictions chosen, instead focusing on the geographic component. The Court follows suit.

**Figure 1: Eastern Gulf of Maine Alternatives**



The Council chose, and the Service approved, protection of the Small Eastern Maine area only, with a full prohibition on mobile bottom-tending gear there.  See 83 Fed. Reg. at 15241–42.  Although not strictly one of the three alternatives outlined above, the FEIS refers to it as "a

variation of Alternative 3," since it does protect one of the three areas that composed that alternative. See EFH 6207.

CLF takes issue with the Service's approval of this designation. Reduced to its core, Plaintiff's suggestion is that it was arbitrary and capricious for the Service to approve a plan that did not protect additional habitat. See Pl. Mot. at 32–33. The Court's earlier analysis interpreting the MSA, however, dispenses with two varieties of CLF's claim. First, to the degree it contends that the Service was required to adopt the maximum conservation measures that did not result in an extreme economic hardship to fishers, the MSA does not so require. Second, and similarly, the Court sees no evidence in the record that the Service or the Council misunderstood the statute's directive. What is left, then, is Plaintiff's contention that there does not exist an adequate explanation establishing a rational connection between the facts found and the decision rendered. See Pl. Mot. at 33. Probing this challenge requires the Court to look through the record of the Council's rejection of — and the Service's approval of that rejection of — measures in the Machias, Large Eastern Maine, and Toothaker Ridge regions. In so doing, it does not find the record to manifest the deficiencies Plaintiff promises.

What the record does reveal is consideration of the impacts of each proposed closure on the effected habitat and fishing communities. See, e.g., EFH 6207–21 (habitat impacts); EFH 6347–60 (human impacts). As all sides agree, these are factors the Council was permitted — and even obliged — to consider in determining whether a closure was practicable. See Am. Oceans Campaign, 183 F. Supp. 2d at 4 (requiring decision based on "relevant factors"). When all was said and done, the Council concluded that this balance favored establishing a habitat closure only in the Small Eastern Maine area because that area "protect[s] habitats of similar species as the large area that was considered, but with fewer economic impacts on the fishing industry." 83

Fed. Reg. at 15242. For the reasons mentioned below, the Court locates in the record a satisfactory explanation connecting the facts found with this conclusion. See State Farm, 463 U.S. at 43. No more is required.

Compared with the other closures considered, the Small Eastern Maine area comprises the habitat most vulnerable to bottom-trawling gear. See EFH 6212 (mapping relative vulnerability). In general, the magnitude of positive impact from a closure depends on the vulnerability of the management area to negative impact from fishing. See EFH 6201. This habitat, moreover, is especially important to the managed species. The Council's expert analysis concluded that this area had a significantly higher abundance of managed fish over the past decades compared to the other proposed closures. See EFH 6217 (map of relative weighted persistence showing concentration in Small Eastern Maine region); EFH 6199 (defining weighted persistence as measure of "the number of decades in which the species was present" and "the relative abundance of the species"); see also EFH 6221 ("In addition, the very far above average weighted persistence areas are included within th[e Small Eastern Maine] HMA, and do not overlap the Toothaker Ridge or Machias HMAs."). Combining these features, the Council concluded that, relative to the other areas, "the Small Eastern Maine HMA appears to potentially provide the most habitat protection." EFH 6221.

On the other side of the scale, the impact of the closure on fishing communities was especially minimal. Despite being larger than either the Toothaker Ridge or Machias HMAs, see EFH 6221, the area generates significantly less revenue from the types of fishing affected by a closure. Purse Seine — a midwater gear used in the herring fishery, see EFH 6209 — and lobster traps are the two principal drivers of revenue in the Small Eastern Maine HMA, neither of which is subject to a prohibition on mobile bottom-tending gear. See EFH 6347–49 (graph of

fishing revenue); EFH 6350–51 (table of fishing revenue); EFH 6221 (noting that purse-seine gear "is not considered to be bottom-tending and therefore is not expected to cause adverse impacts on seabed habitats").

Turning to the other regions, it is understandable why the calculus that led the Council to conclude that the Small Eastern Maine HMA warranted protection yielded different conclusions for the other potential closures. Compared with Small Eastern Maine, those potential fishing closures would provide fewer benefits to habitat but have a higher adverse economic impact on fishers.

In Machias, for example, the Council concluded that the habitat is "somewhat less vulnerable to accumulating adverse effects of fishing due to more rapid recovery times associated" with the type of habitat. See EFH 6219; see also EFH 6212 (map of trawl vulnerability). The habitat also evinces a markedly lower prevalence of protected species than other areas in the Gulf of Maine. See EFH 6217. Further, this HMA's proximity to Canada could dampen the effectiveness of any fishing prohibition. Because "portions" of the Machias HMA are in the grey zone, an area that can be fished by both U.S. and Canadian vessels, these waters "could continue to be fished with mobile bottom-tending gears by Canadian" boats, even if the U.S. were to forbid such gear. See EFH 6220. This occurrence "would undermine the effectiveness of the mobile bottom-tending gear closure and compromise habitat recovery." EFH 6219. A closure there, however, would have a larger impact on U.S. fishing communities than a closure in the Small Eastern Maine HMA. In particular, the clam and scallop fisheries have "the most potential revenue displacement," at levels that far exceed any fishery in Small Eastern Maine. Compare EFH 6355 (revenue displacement in Machias between 8% and 17% of

average revenue per trip) with EFH 6358 (revenue displacement in Small Eastern Maine generally less than 1%).

Toothaker Ridge tells a similar story. Like Machias, the habitat type is "relatively less vulnerable and consists mainly of mud-dominated areas." EFH 6221; see also EFH 6212 (maps of trawl vulnerability and dominant substrate). On the economic side of the scale, the magnitude of bottom-trawl fishing in this area is greater than in Small Eastern Maine. See EFH 6359. The Council thus concluded that, in comparison to Small Eastern Maine, closing Toothaker Ridge would have a larger impact on these fishers. Id. ("A complete exclusion of mobile bottom-tending gear [in Small Eastern Maine, Machias, and Toothaker Ridge would] . . . mainly affect[] bottom trawl fisherman in the vicinity of Toothaker Ridge, and clam dredge fisherman around Machias."). A closure here, moreover, would have disproportionate effects on a small number of fishers, rather than dispersing the economic pain among a larger fleet. Id. (noting that data "suggest[s] that a few individuals utilize this area more intensively than the majority of individuals fishing in the area"). This, too, is a rational reason to be wary of closing the area.

The Service's decision in Large Eastern Maine, although ultimately sufficiently articulated and rational, is harder to understand. On the one hand, in support of the Service's decision, maps of the region do show minimal trawl vulnerability. See EFH 6212. But on the other, like Small Eastern Maine — which, as a reminder, is a wholly included subset of Large Eastern Maine — both show above-average abundance of managed fish. See EFH 6217. The larger area also holds benefits that the smaller, protected area does not: unlike the Small Eastern Maine HMA, "the Large Eastern Maine HMA is expected to afford more protection for deeper water species and lifestages, such as adult monkfish." EFH 6219–20. Then again, by virtue of its size, closing the larger region would have significantly larger economic consequences. See

EFH 6358 (noting that "the Small Eastern Maine area encompasses roughly 23–28% of the revenue associated with the Large Eastern Maine area").

Two arguments in the record ultimately tip the scales in the Service's favor. First, the Council acknowledged the habitat value of the area, but justified its action out of a "concern[] that closing the area to mobile bottom-tending gears could affect the local scallop fishery." EFH 6758. Although the support for this proposition in the administrative record is a bit thin, it is present. See EFH 6347 (graph showing revenue from "other gear"); EFH 6355 (noting that "other gear" includes scallop dredges, which "cannot be detailed for privacy purposes"); EFH 6358 (similar). Second, the record reveals why the Council may have been particularly concerned with adverse economic impacts on the fishing community. It points out that these impacts of those closures would target "smaller coastal communities that have high levels of engagement and reliance on commercial fishing and have limited economic opportunities outside of fishing and relatively high social vulnerability indices." EFH 6357. At bottom, the Service's decision checks out.

This tour of the record demonstrates what the Service needs it to. It shows the Court that the "major issues of policy were ventilated" and permits it to see "why the agency reacted to them as it did." Republican Nat. Comm. v. FEC, 76 F.3d 400, 407 (D.C. Cir. 1996) (citation omitted). The Service, aided by the Council, considered the relevant factors of habitat protection and economic impact and reached a conclusion that protected habitat in Small Eastern Maine only. The "rational connection between the facts found and the choice made" is evident. See State Farm, 463 U.S. at 43.

Plaintiff offers three retorts to this conclusion. First, it notes that the record is rife with concessions that the adverse economic impacts of closing additional areas are not particularly

substantial.  See, e.g., EFH 6356 (noting that closure in Machias and Large Eastern Maine "has a relatively small impact on the total revenues"); id. (noting that short-term impacts are "expected to be slightly negative").  Making a judgment about the level of economic impact that justifies excluding a closure, however, is beyond this Court's role.  "[T]he proper function of the court is not to weigh evidence anew," NRDC, 71 F. Supp. 3d at 61, and it is similarly "forbidden from substituting [its] judgment for that of the agency."  U.S. Telecom Ass'n v. FCC, 825 F.3d 674, 697 (D.C. Cir. 2016) (citation omitted).  The weighing of relevant factors is a judgment left to the Agency.  That CLF would have reached a different conclusion is of little moment under this standard of review.

Second, Plaintiff points out that a draft Environmental Impact Statement concluded that both Alternatives 2 and 3 — which would have closed far more ocean habitat to fishing — could "likely be considered practicable."  EFH 4177.  This early finding gives the Court some pause.  For although the Agency is imbued with significant discretion, that delegation largely lies within the statutory language to limit actions to those "practicable."  An Agency's conclusion that an action is practicable seems to be the conclusion of a discretionary inquiry, rather than one factor to be weighed in that process.  It seems that the Agency would need to provide a compelling reason to discard an alternative that was both practicable and had a measurably positive effect on essential fish habitat, provided that the habitat was subject to the adverse effects of fishing.

Ultimately, however, the document's draft status dissuades the Court from placing much weight on it.  Absent this document, the Court would uphold the Service's action in this sub-region for the reasons already explained.  The inclusion of the draft does not upset this decision.  That the record shows some early reticence is of little significance.  The Council, certainly, is not bound to the conclusions it reaches in the draft document, which was prepared well before the

Council selected its preferred alternatives. The Final EIS, which like the draft was prepared by the Council in cooperation with the Service, supersedes the earlier document. It is thus the reasoning and conclusions in the final document that serve as the operative portion of the record in this regard.

As a final retort, CLF takes issue with the fact that there is no explicit practicability finding in any of the final documents justifying the Council's decision and the Service's approval of that decision. The Court's search for any law imposing this procedural requirement, however, comes up empty. The Service need only articulate a reason for its decision based on relevant factors and grounded in the facts found in the record. This it has done. Similarly, CLF's repeated assertions that it thinks the unchosen alternatives are practicable does not persuade the Court. It is the Service's judgment that matters in this respect, not Plaintiff's.

b. Central Gulf of Maine

Next up is the Central Gulf of Maine, represented in Figure 2. Unlike its eastern neighbor, parts of this area received habitat protection prior to this Amendment. With some exceptions, the Habitat Amendment kept in place the prior regime, but altered protection in a couple of areas and modified the boundaries in another. CLF's challenge to this region is twofold. In this Amendment, the Council maintained one region — Cashes Ledge — as a groundfish closure, a protective measure that diverges in some respects from the habitat closures that define the other areas. Not re-designating this area as a habitat closure, CLF says, was arbitrary and capricious. See Pl. Mot. at 34–35. Similar to the Eastern Gulf, it also believes that an additional area — here, Platts Bank — warranted closure. Id. at 35.

**Figure 2: Central Gulf of Maine Alternatives**



i. Cashes Ledge Groundfish Closure Area

Some background may help to set the stage. Much of the debate turns on a series of closures surrounding Cashes Ledge, which lies almost due south of the Toothaker Ridge. In 2002, in response to a declining Atlantic cod population — a species within the groundfish

fishery — the Service closed a large area surrounding Cashes Ledge to gear capable of catching groundfish. See EFH 7170. In this Amendment process, the Council considered doing away with this closure, which would have opened up much of these waters to such fishing. See EFH 6237. Although the Council ultimately opted against this tack, CLF says it should have gone a step further and re-designated the area encompassed within the groundfish closure as a habitat-management area. These two types of closures differ some in purpose and application and the latter, Plaintiff says, could be more protective. The Court now dives into these waters.

Reduced to its bones, CLF suggests that the administrative record required the Council to have designated the entire Cashes Ledge as a habitat-management area, instead of merely maintaining it as a groundfish closure. The building blocks for this argument appear to be as follows. Plaintiff contends that the Council analyzed the area's habitat value but then, in discussing the manner to protect that habitat, pulled a fast one. See Pl. Mot. at 17, 34. The Council, it says, "assumed the whole area would be protected as a habitat-management area and closed indefinitely," when in fact the approved measure was merely a groundfish closure, which, unlike a habitat closure, is subject to reopening when the stock of the relevant fish population — here, Atlantic cod — sufficiently rebuilds. Id. at 34; see also id. at 19. Without further explanation, CLF does not think that the Council has provided a reasoned basis why the groundfish closure provides enough protection to the underlying habitat. See Pl. Opp. & Reply at 6. Therefore, Plaintiff says, the Service's decision to maintain a groundfish closure is unsupported by the record. Id. at 7.

The Court reads the record differently. To begin with, to the degree CLF means to imply that the Council or the Service operated under a misconception about the effects of a groundfish closure, the record flatly contradicts this claim. In the federal-register discussion of

the Council's deliberations, the Service explicitly delineated the differences between the two types of closures. See 83 Fed. Reg. at 15253. Nor is there anything in the record to indicate that the Council — the expert body charged with recommending fishing restrictions — misunderstood the effect of a groundfish closure. See, e.g., EFH 6235 (discussing the groundfish closure).

The question then becomes whether the Council's decision to retain a groundfish closure finds support in the record. Some context helps here regarding the daylight between a habitat closure and a groundfish closure. In essence, these two measures are different sides of the same coin. By restricting fishing gears capable of catching groundfish, a groundfish closure seeks to protect those species directly by limiting their exposure to fishers, thus boosting their productivity and ensuring a more sustainable population. See Conservation Law Found., 37 F. Supp. 3d at 240 ("Closed areas 'protect[ ] a segment of the [fish] stock' and also 'specifically enhance' those 'ecosystem and stock characteristics [that] affect groundfish productivity.'"); 82 Fed. Reg. at 46750 ("These goals are focused on enhancing groundfish productivity and maximizing the societal net benefits from groundfish."); Pl. Mot. at 13 n.4 ("A groundfish mortality closure is an area that has been closed to fishing boats or gear capable of catching a particular species for the purpose of reducing the total catch of that species by the fleet.").

The immediate purpose of a habitat closure, on the other hand, is the protection of vulnerable habitat. But the reason for this protection brings this analysis full circle. As the Council put it, the "underlying premise" is that "habitats [are] linked to higher survival and/or growth rates of juvenile fish." EFH 7808. Protecting such habitats thus can boost "stock productivity" of aquatic populations. See EFH 7864. This should sound familiar. Importantly, there is often significant — and sometimes complete — overlap between gears capable of

catching groundfish and the mobile bottom-tending gears often prohibited in habitat closures. In this case, the difference between a groundfish closure and a habitat closure — *i.e.*, that protection of habitat is not the primary goal of a groundfish closure — is largely academic. See Pl. Mot. at 13 n.4 (noting that a groundfish closure "is not closed for habitat protection purposes, although the benthic habitats do benefit from the absence of fishing gear damage"). In practice, this distinction between the two primary types of closures in the Cashes Ledge area reveals little difference, with one exception discussed below.

The Court, consequently, finds no prohibition on employing a management tool originally developed for another purpose to support a habitat goal. CLF's abstract contention that the area should be protected "for its habitat value" — as opposed to, presumably, groundfish-rebuilding purposes — finds no success here absent some concrete difference between the two closures. And, as CLF concedes, both restrict "virtually the same fishing gears" in the short term. See Pl. Opp. & Reply at 6. Nor does the Court see any other categorical reason that the Service cannot rely on the effect of a groundfish closure for its effect on habitat. See 83 Fed. Reg. at 15242 (noting habitat value of groundfish closure). While it is certainly true that some other types of fishing restrictions "do not necessarily" satisfy the aims of protecting habitat, see Oceana, 2005 WL 555416, at 33, there is almost complete overlap here.

Plaintiff does point to one key difference. It is temporal: the groundfish closure will be re-evaluated should cod populations improve and may be scrapped, while a habitat closure would not be subject to this process. For two reasons, the delta between this process and a hypothetical HMA designation is small. For one, habitat measures themselves are subject to periodic review — in this case, every ten years. See 50 C.F.R. § 600.815(a)(10); 83 Fed. Reg. at 15276. Second, as the Government points out, the Council will have to grapple with the effects on habitat of any

decision to remove the groundfish closure in response to a rebuilt stock. See Def. Opp. & Mot. at 25. This is because that decision would come with an amendment to the groundfish FMP, which itself must comply with the EFH provision. See 16 U.S.C. § 1853(a). In approving the Habitat Amendment, the Service explicitly acknowledged this requirement. If the "Council [were to] decide in the future to remove the fishing restrictions in response to the full recovery of Gulf of Maine cod," the Service said, it "would need to consider how the changes minimize the adverse effects of fishing on EFH to comply with the Magnuson-Stevens Act." 83 Fed. Reg. at 15253.

If that is all true, Plaintiff retorts, and the existing groundfish closure provides sufficient ancillary habitat protection, then how can the Council's action regarding Fippennies Ledge be explained? See Pl. Opp. & Reply at 7, 10. Some brief explanation may help to place this question in context. The Habitat Amendment established a new habitat-management area — Fippenies Ledge HMA — which the Council closed to all mobile bottom-tending gear. See 83 Fed. Reg. at 15242. This HMA, however, lies wholly within the larger groundfish closure. See EFH 7813. CLF's point thus appears to be that, if a groundfish closure sufficed to protect the rest of the habitat in the area as the Government contends, then surely the same would be true of Fippennies Ledge, rendering the Council's action redundant. See Pl. Opp. & Reply at 7, 10. The Government has an obvious response: should the Council later remove the groundfish restriction, then Fippennies Ledge, home to especially vulnerable habitat, would continue to warrant protection. See Def. Opp. & Mot. at 25–26.

But, Plaintiff rejoins, does this same theory not apply to the rest of the closure? See Pl. Opp. & Reply at 7, 10. Asked another way, if the Council thinks the whole area warrants protection now, would it not still warrant protection if the cod population rebuilds? This

argument falters in its premise and logic. For one, it is not clear that the Council ever concluded that the level of protection offered by the closure was <u>necessary</u> for EFH minimization. The Service read the Council's decision as concluding that it needed to keep the closure for groundfish purposes, and the effect on EFH protection, although welcome, was mostly a bonus. <u>See</u> 83 Fed. Reg. at 15242 (noting that although groundfish closure maintained to "support[] the goals and objectives of improving groundfish productivity," it "will also ensure that a more diverse array of bottom habitats that support a greater variety of species remain protected"). The Court sees nothing irrational in this reading.

Further, the record is rife with reasons that the Fippennies Ledge HMA may warrant a higher level of protection than the rest of the seabed in the groundfish closure. The key difference between the two closures, readers will remember, is that the groundfish closure's protection may be re-evaluated earlier than that for Fippennies Ledge — *i.e.*, if cod populations bounce back before the Council reviews HMA designations. A varying level of habitat vulnerability between the two areas would explain this disparate treatment. The record so provides. While the management areas in the region consist of "higher vulnerability" substrate, the rest of the Cashes Ledge Groundfish Closure Area is an exception. <u>See</u> EFH 6222. It is characterized by a "mix of shallow coarse sediment . . . around a central mud basin," which results in lower habitat vulnerability. <u>Id.</u> Conversely, the ledge and bank features — those subject to the current HMAs — are "among the most highly vulnerable in the sub-region." EFH 6235. Given the differences in habitat vulnerability pointed out by the Council, the Court concludes that the administrative record supports the Service's decision.

ii.  Platts Bank

Cruising northwest from Cashes Ledge, the Court next arrives at the dispute concerning

Platts Bank.  This one is reminiscent of earlier challenges discussed.  The Council rejected a

habitat closure in Platts Bank based largely on economic impacts on fishing communities, and

the Service approved this move.  Because Plaintiff offers no contention that it considered an

improper factor — or, more accurately, no contention unresolved by the Court's conclusion

about what the MSA requires — the nature of judicial review largely limits CLF, once again, to

contending that the record cannot support the conclusion.  On this count, it again falls short.  The

Court will run through the Agency's reasoning before addressing any lingering rejoinders.

In approving the Council's decision not to implement a closure in Platts Bank, the

Service relied on its "concern regarding the displacement of current fishing and the economic

impact to a sub-set of the fleet."  See 83 Fed. Reg. at 15260.  CLF's challenge is straightforward.

It contends that this determination about the adverse economic impacts is unsupported by the

record.  As evidence, it maintains that the "actual practicability analysis" concluded that the

economic impact on fishers "if those Platts Bank areas were closed would be 'relatively

marginal/negligible'" and might even "be beneficial to fishers" in the short term.  See Pl. Mot. at

35 (citing EFH 6371, 7840).

Plaintiff misreads the record.  The reference to "relatively marginal/negligible" harms, as

well as the benefit to fishers, does not refer to the effect of closing Platts Bank alone.  As noted

earlier, the Council combined various permutations of new or modified closures in formal

alternatives, for which it then conducted a comparative analysis.  Here, the reference is to the full

suite of changes embodied by one of these alternatives — Alternative 3 — which also consists of

modifying the boundaries on the Jeffreys Bank and Cashes Ledge habitat areas, designating new

management areas on Ammen Rock and Fippennies Ledge, and, importantly, doing away with Cashes Ledge groundfish closure.  See EFH 6370–71.  Given that this Alternative would open significant square mileage of ocean to fishing, the conclusion that the Alternative in total might have some economic benefit is hardly surprising.  See EFH 6239.

The analysis unique to Platts Bank, conversely, directly supports the Service's conclusion.  In 2013, one of the Council's teams reported that scallop fishing was occurring on Platts Bank.  See EFH 6360.  After further investigation, it discovered that a small number of individuals were responsible for a large portion of the scallop dredging in the area.  Specifically, five individuals accounted for 90% of the revenue and 65% of the trips to the region.  Id.  The sum of the revenue potentially displaced by the closure was significant to those fishers: scallop fishing in the Platts Bank region accounted for nearly 40% of an average fishing trip's revenue.  See EFH 6370.  From these numbers, the Council determined that closing Platts Bank would "have a large impact on fishing vessels from the midcoast Maine area."  EFH 6371–72.  "These vessels," the Council concluded, "are highly dependent on groundfish in these areas."  See EFH 6372.  The Service's view that the Council's decision rested on the adverse "economic impact to a sub-set of the fleet" is thus amply supported by the administrative record.  See EFH 55745.

Not yet content, CLF in its Reply brief returns to some of the same arguments the Court found unpersuasive in the earlier discussion of management measures taken in the Eastern Gulf of Maine.  It reiterates its position that because the Council determined that the full Alternative — which, again, includes eliminating the groundfish closure and a number of other changes — would not result in significant economic hardship, the Council was bound to determine that the option was practicable and then bound to implement it.  Again, this misses the distinction between the impact of the full Alternative 3 and the impact of Platts Bank alone.  Even setting

this point to one side, CLF still comes up empty.  As the Court has already explained, CLF's line

of reasoning both confuses the MSA's mandate and usurps the Agency's role in balancing

complex factors.  Finally, CLF also points to the draft document in which the Council tentatively

concluded that the full Alternative "appears to be moderately practicable."  EFH 4178; see also

Pl. Opp. & Reply at 10.  For the reasons the Court rejected a similar argument earlier, it finds it

no more persuasive this time around.  It also notes that even if the Agency concluded that it

would be practicable to implement the full suite of options embodied by that Alternative, it does

not necessarily follow that the same conclusion applies to closing Platts Bank alone — i.e.,

without also opening up other areas to fishing simultaneously.

In sum, the Agency's line of reasoning is apparent.  It is reasoning with which Plaintiff

may not agree, but that disagreement does not render it irrational.  See State Farm, 463 U.S. at 43

(holding that agency is required only to "articulate a satisfactory explanation for its action

including a rational connection between the facts found and the choice made").

### c.   Western Gulf of Maine

This expedition through the waters of the Gulf of Maine is nearly complete.  The final leg

of the Court's trip takes it to the Western Gulf of Maine, an area that lies in the broad swath of

water south of Portland and east of Boston and is represented in Figure 3.  The Service's

approval of two specific changes serves as the entrée for the Court's discussion of this region.

First up are two overlapping management areas called, uninventively, the Western Gulf of Maine

Habitat Closure Area and the Western Gulf of Maine Groundfish Closure Area.  Prior to this

Amendment, the northern, western, and southern boundaries of these two areas overlapped, but

the eastern boundary of the groundfish closure extended some miles beyond that of the habitat

closure.  See EFH 7814.  The Habitat Amendment modified the former to align with the latter —

*i.e.*, moved westward the groundfish closure's eastward boundary, thus reducing by roughly 25% the area covered and opening up those waters to fishing.  See 83 Fed. Reg. at 15246.  Plaintiff, understandably, is not a fan of this action.  The Council also considered but rejected establishing a new management area called the Bigelow Reserve closer to the coast.  CLF believes that its failure to do so was a mistake.  The Court takes each contention in turn.

**Figure 3: Western Gulf of Maine Alternatives**



i.   Groundfish Closure Area

Start with the change to the Western Gulf of Maine Groundfish Closure Area.  The Service approved this decision because the "bottom habitats just outside the eastern boundary of the current groundfish closure are primarily deeper, low vulnerability mud habitats."  83 Fed. Reg. at 15253.  Allowing groundfish-fleet access into these "productive fishing grounds" would thus have "approximately the same level" of impact on groundfish resources, but in a "less costly, more practicable way."  Id.  Plaintiff's attack here is straightforward and reminiscent of its prior arguments.  The Service's conclusion, it says, is not supported by the administrative record.  To vet this claim, the Court first runs through the Agency's analysis before once again diving into the record's cavernous waters.

In determining that the changes to the groundfish closure complied with the MSA's directive, the Service weighed both the habitat value of protecting the seabed and economic objectives.  Compared with the seabed that remained protected, the five-nautical-mile-wide stretch opened in the Amendment consists of "primarily deeper, low vulnerability mud habitats." Id.; see also id. at 15246 ("[T]he area remaining closed has more vulnerable habitat than the area being opened.").  This habitat variation meant that, even after opening up this swath to fishing, the smaller closure would deliver "approximately the same level" of protection, see id. at 15253, "albeit slightly less beneficial than the status quo."  Id. at 15246.  Turning to the other side of the scale, the Service concluded that the Amendment to the closure provided some economic benefits to fishers.  "Allowing the groundfish fleet into [these] productive fishing grounds," it said, would be "less costly."  Id. at 15253.  Opening up these waters, while retaining the full habitat closure, the Service thus concluded, would constitute a "more practicable way" to protect against the adverse effects of fishing.  Id.  Along similar lines — although admittedly lacking in

some of the nuance evident elsewhere in the Service's analysis — the Record of Decision summarizes the change as "maintain[ing] the same positive impacts on habitat and groundfish resources as the existing closures, with the same economic benefits."  EFH 8919.

CLF's contention is that the record shows that the larger area has superior habitat benefits, while resulting in similar economic consequences.  See Pl. Mot. at 36.  From this premise, it concludes that the only rational decision was for the Service to retain the full groundfish closure.  Id. at 36–37.  The Court has already rejected Plaintiff's weighing of the factors considered.  This deficiency aside, the record is again CLF's foe on this front.

The Court's perusal of this tome finds fertile ground for the Service's determination.  The Council, too, determined that the "eastern sliver" of the Western Gulf of Maine Closure Area consisted of less vulnerable habitat.  See EFH 6254.  Unlike the adjacent ledge and bank features to the west, this sliver is "relatively deep and muddy" and "likely less vulnerable to impact than nearby structured habitats," which remain protected.  See EFH 6256.  The trawl vulnerability and substrate maps generated by SASI's analysis of the substrate corroborate these determinations.  See EFH 6246.  As CLF points out, it does appear that this sliver contained one "shallow feature," an oceanic area with the seemingly incongruous name of Wildcat Knoll.  See Pl. Opp. & Reply at 17 (citing EFH 6254); see also EFH 6257 (noting that Wildcat Knoll consists of gravel habitat).  Even so, the Court does not think that the existence of one relatively small feature within the broader area so disturbs the Council's finding that the full area consists of less vulnerable habitat so as to render its decision irrational.

The same is true of the economic side of this equation.  The preferred alternative, which would "[s]hift[] the boundary west by approximately five nautical miles[,] could reduce steam times by an hour or so per day" for the area's fishers.  See EFH 6385.  For reasons related to the

cod-catch rate in the area, the Council also found that "there is some benefit to opening [these] areas . . . to fishermen." EFH 6385. Although present, the Council — as the Service recognized — did not find the magnitude of these economic benefits overwhelming. Rather, they would "likely" fall somewhere along a spectrum from "small to negligible." Id.

With the decisions supported in the record, CLF next attacks the Service's calculus. It contends that keeping the full groundfish closure off limits was "practicable"; because that option would "produce[] superior beneficial EFH results," the Service was thus required to conclude that the Council's decision ran afoul of the MSA. See Pl. Opp. & Reply at 11. Once again, this mode of argument comes up empty, for reasons that have now been rehearsed seemingly *ad infinitum* in this Opinion. It is precisely the weighing of relevant factors that falls to the expertise of the Agency. This Court will not accept CLF's invitation to substitute its judgment. See U.S. Telecom Ass'n, 825 F.3d at 697.

To the degree CLF contends that the Service did conclude this option to be practicable based on the 2014 draft document, see Pl. Opp. & Reply at 11, the Court does not ascribe to it the weight Plaintiff urges for the reasons already mentioned.

That being said, the Court is not blind to the oddity of this situation. The Council undertook this Amendment process with the stated goal of minimizing to the extent practicable the adverse effects of fishing on habitat and then, in the Western Gulf of Maine, opted for an edit to existing management measures that reduced square mileage of waters closed to fishing. But, consistent with the Court's earlier analysis, it would have little difficulty upholding this suite of management closures had there been fewer or no pre-existing restrictions. And CLF has not provided, nor has the Court been able to independently draw up, any good reason why a different

initial condition should change the discretion afforded to the Secretary in balancing the factors associated with a particular measure.

## ii. Bigelow Bight

With that, the Court turns to the final challenge under the MSA: Bigelow Bight. This one need not be long. The Service approved the Council's recommendation to forgo this closure because of the economic impacts that would ensue. See 83 Fed. Reg. at 15253. CLF again says that the record does not support the result. The Court, nonetheless, has little problem finding the rational line between the facts found there and the Agency's action.

The Service offered the following rationale in approving the Council's determination: "NFMS agrees with the Council's determination that they would incur unacceptable costs to the industry, particularly the inshore groundfish fishery and are, therefore, impracticable." Id. Ample support exists in the record for this conclusion. The Council found that a "diverse, and relatively stable, assemblage of fishing gears" was used in the area. See EFH 6390. The consequences of closure would be broad ranging, as it would be felt "across all commercial gear and recreational fleet[s]," and "from Maine to Massachusetts." EFH 6392. More specifically, a restriction on mobile bottom-tending gear would affect over one million dollars in revenue, according to data collected over a three-year period. See EFH 6391. The harm would not be distributed equally. The shrimp fishery would likely be disproportionately affected, see EFH 6392–93, as would "smaller vessels that are not able to adapt and fish further offshore." EFH 6396. These vessels would be "highly impacted." EFH 6394. Nor would the harm be geographically distributed. Rather, "the impact on New Hampshire fishermen in particular is likely to be acute." EFH 6391.

But wait, says CLF: there may be long-term benefits to fishers if the groundfish stock improves, even if they take a short-term hit. See Pl. Mot. at 38. Plus, CLF contends, the short-term consequences are not that bad: the Council concluded that for some options, they would only be "moderately" negative for some fishers, and even moderately positive for others. See Pl. Mot. at 38.

By now, readers can likely anticipate the Court's response. For one, nothing in the MSA requires the Service to prioritize long-term over short-term consequences in weighing the importance of adverse economic impacts. Second, CLF's view as to the significance that should be placed on the magnitude of the economic harm bears little fruit in such a review. The fact that the Service plainly has a rational basis for its determination supported by facts found and explained in the record, even if its conclusion is not the one CLF prefers, is sufficient to uphold its action. See State Farm, 463 U.S. at 43. The proper balancing of appropriate factors is within the province of the Secretary. Third, and finally, CLF's characterization of the administrative record is suspect. In the portions of the record it cited, the only short-term positive benefits accrue to one certain category of fishers for reasons entirely irrelevant to a potential closure on Bigelow Bight. Rather, those benefits accrue because other aspects of the alternative under consideration would remove fishing protections in areas frequented by these fishers. See EFH 6394 ("The access to the northern part of the Western Gulf of Maine closure may have positive social impacts on larger vessels."); EFH 6396 ("Alternative 5 is expected to induce moderate positive economic benefits to the gillnet and longline fisherman, by opening currently closed areas to fishing and decreasing interactions between static and commercial mobile gear."). The Service's approval of a Plan that does not provide protection measures in Bigelow Bight thus complies with the MSA. And with that, Plaintiff's last MSA-related domino falls.

\*    \*    \*

This lengthy exposition of Plaintiff's MSA challenges ultimately results in a simple conclusion. The Government prevails. In arriving at this outcome, the Court offers no comment on the policy wisdom of the Service's Amendment. Its role does not extend so far. Indeed, it merely finds that the Agency has articulated a satisfactory line of reasoning based on facts in the record. That is sufficient.

B. NEPA Claim

Next up is CLF's challenge under the National Environmental Policy Act, better known by the acronym NEPA. As best the Court can tell, Plaintiff's attack is launched on two fronts. First, it believes that the Final Environmental Impact Statement (FEIS) fails to consider a reasonable range of alternatives, as NEPA directs. See Am. Compl., ¶¶ 113–22. Second, CLF takes issue with the Agency's decision to delay consideration of coral-protection measures. Id., ¶¶ 123–29. After outlining the legal framework that governs these challenges, the Court takes on each separately.

1. *Legal Framework*

NEPA has two aims: first, it "places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action," and second, "it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." Balt. Gas & Elec. Co. v. NRDC, Inc., 462 U.S. 87, 97 (1983) (citation omitted). NEPA's requirements are "procedural," requiring "agencies to imbue their decisionmaking, through the use of certain procedures, with our country's commitment to environmental salubrity." Citizens Against Burlington, Inc. v. Busey, 938 F.2d 190, 193–94 (D.C. Cir. 1991). Importantly, "NEPA does not mandate particular consequences," id. at 194,

and courts are discouraged from substituting their own policy judgments for that of the agency. See N. Slope Borough v. Andrus, 642 F.2d 589, 599 (D.C. Cir. 1980); see also Marsh v. Or. Nat. Res. Council, 490 U.S. 360, 378 (1989). "NEPA merely prohibits uninformed — rather than unwise — agency action." Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 351 (1989). Agency actions with adverse environmental effects can thus be NEPA compliant where "the agency has considered those effects and determined that competing policy values outweigh those costs." Ohio Valley Envtl. Coal. v. Aracoma Coal Co., 556 F.3d 177, 191 (4th Cir. 2009) (citations omitted).

Under NEPA, an agency must prepare an Environmental Impact Statement for any proposed major federal action "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The approval of FMPs and amendments to FMPs are considered major federal actions within the meaning of NEPA, see Oceana, 831 F. Supp. 2d at 101–02, and the Council, in cooperation with the Service, prepared an EIS here. See EFH 6158. In an EIS, the agency is required to "take a 'hard look' at the environmental consequences before taking a major action." Balt. Gas, 462 U.S. at 97 (citations omitted). An EIS must detail the environmental impact of the proposed action, any adverse effects, alternatives to the proposed action, the relationship between the short-term uses and the long-term effects, and any irreversible commitments of resources. Id. at 89 n.1; see also Fund for Animals v. Hall, 777 F. Supp. 2d 92, 96 (D.D.C. 2011).

2. *Range of Alternatives*

With CLF's first cast into NEPA's waters, it contends that the FEIS came up short on one of these latter requirements: the statutory command to consider "alternatives to the proposed action." 42 U.S.C. § 4332(C)(iii); see also Pl. Mot. at 40–43; Pl. Opp. & Reply at 20–23; Am,

Compl., ¶¶ 113–22.  This dispute appears limited to the Agency's actions in the Western Gulf of Maine.  See Am. Compl., ¶¶ 113–22.  As the Court will explain in a minute, baked into this contention are two sub-issues — namely, that the Agency's choices are unreasonable because, first, it opted not to consider several viable alternatives, and second, the range of alternatives analyzed is unjustly skewed toward no action.  To properly tackle these contentions, the Court starts with the applicable law.

a.  Set Up

Both NMFS regulations and case law in this circuit expand on NEPA's demand that an agency consider alternatives to its proposed action.  This alternatives analysis is the "heart of the environmental impact statement."  40 C.F.R. § 1502.14.  Presenting the alternatives in "comparative form," the agency must "[r]igorously explore and objectively evaluate all reasonable alternatives."  Id.  § 1502.14(a).  Central here is the proper scope of "reasonable alternatives."  As the D.C. Circuit has pointed out, the words "reasonable" and "alternative" are not "self-defining"; they mean little without "reference to something else."  City of Alexandria v. Slater, 198 F.3d 862, 867 (D.C. Cir. 1999) (citation omitted).  That court has thus offered some guidance to chart a course for reviewing courts.

The upshot of this guidance is a two-step inquiry.  For reasons that will be clear in a minute, the first step is to determine whether the agency's objectives in its action are reasonable.  Id.  If the agency "look[s] hard at the factors relevant" in molding its objectives, then they will generally be upheld.  Theodore Roosevelt Conservation P'ship v. Salazar, 661 F.3d 66, 73 (D.C. Cir. 2011) (alteration in original) (citation omitted).  This leeway, however, is not limitless.  Objectives are "unreasonably narrow" if they "compel[] the selection of a particular alternative."  Id.

If the objectives pass muster, they serve as the needed reference for the court's evaluation of the range of alternatives, which serves as the second step of the inquiry. The court evaluates the "agency's choice of 'reasonable alternatives' . . . in light of the objectives of the federal action." City of Alexandria, 198 F.3d at 867. It is thus "[t]he goals of an action" that "delimit the universe of the action's reasonable alternatives," Theodore Roosevelt Conservation P'ship, 661 F.3d at 72 (alteration in original) (citation omitted), rather than "any particular number of alternatives considered." Friends of Capital Crescent Trail v. Fed. Transit Admin., 877 F.3d 1051, 1063 (D.C. Cir. 2017). If "it would be reasonable for the agency to conclude that [an] alternative does not bring about the ends of the federal action," then it can properly exclude that alternative from consideration. See City of Alexandria, 198 F.3d at 867 (citation omitted). Along similar lines, the scope of reasonable alternatives "must be moored to 'some notion of feasibility.'" Citizens Against Burlington, Inc., 938 F.2d at 195 (quoting Vermont Yankee Nuclear Power Corp. v. NRDC, Inc., 435 U.S. 519, 551 (1978)). The agency's choices "cannot be found wanting simply because [it] failed to include every device and thought conceivable." Vermont Yankee, 435 U.S. at 551; see also 43 C.F.R. § 46.420(b) ("Reasonable alternatives . . . includes alternatives that are technically and economically practical or feasible and meet the purpose and need of the proposed action.").

It is surely no surprise to learn that judicial review at both steps is deferential. Reasonableness serves as the cornerstone of a reviewing court's concern. See Nevada v. Dep't of Energy, 457 F.3d 78, 93 (D.C. Cir. 2006). It does not substitute its own policy judgments for that of the agency. See N. Slope Borough, 642 F.2d at 599. This inquiry thus involves "considerable deference to the agency's expertise and policy-making role." City of Alexandria,

198 F.3d at 867. A court must also be mindful of not "transform[ing] a procedural statute into a substantive one." Id.

The Court begins, as it must, with determining whether the Service "reasonably defined its objectives for this action." Theodore Roosevelt Conservation P'ship, 661 F.3d at 73. Luckily for the tiring reader, the Court has largely resolved this inquiry already when it concluded that the Service's goals and objectives were reasonably tethered to the MSA's command. See supra, Section III.2.a. Only a few more words on this point are needed.

The Council adopted ten goals followed by fourteen objectives. See EFH 7851–52. These two categories are related; each objective "map[s] to 1 or more of the Amendment's goals and provide[s] more specific guidance on how to achieve that goal." 82 Fed. Reg. at 46750. Although the Court will spare readers a recounting of all 24 points, a few bear mentioning. Most importantly, the Agency sought to "[i]dentify and implement mechanisms to protect, conserve, and enhance the EFH of those species managed by the Council to the extent practicable." EFH 7851 (Goal 4). This goal hews closely to the governing regulations and statute. In order to implement it, the Council articulated several objectives, including to "[m]odify fishing methods" and "[s]upport creation and development of fish habitat where appropriate and when increased fishery resources would benefit society." Id. (Objectives E, G). Much for the reasons already discussed, the Court has little trouble concluding that the Council's objectives — both those mentioned here explicitly and those not — sufficiently consider the relevant factors to pass muster under the rule of reason.

The alternatives come next. In developing this suite of options, the Council employed the same approach everywhere. Across each sub-region, Alternative 1 was a "No Action" alternative, meaning that the Council evaluated the effects of maintaining the existing habitat and

groundfish measures in place, whatever they were.  See EFH 7160.  Alternative 2 removed all year-round closures.  See EFH 7161.  Alternatives 3 and up then consisted of various combinations of new or modified habitat-management areas.  Id.  In the Western Gulf of Maine, for example, the Council considered eight total alternatives.  See EFH 6254–69.

CLF takes no issue with the depth of analysis for each named alternative performed by the Council and approved by the Service.  Rather, it thinks that the Council's consideration of alternatives was incomplete for two reasons.  First, it challenges the Council's decision to reject various alternatives without comprehensive analysis.  Second, Plaintiff contends that the range of alternatives in the Western Gulf of Maine is unreasonable because it skews in one direction — namely, toward limited habitat protection.  See Pl. Mot. at 39; Am. Compl., ¶¶ 113–22.

### b.  Rejected Alternatives

The Court first addresses Plaintiff's unhappiness with the rejected alternatives.  For the sake of clarity, a quick note about this process may be worthwhile.  Agencies abandon alternatives at two different stages.  First, the agency must decide which alternatives it will subject to in-depth review.  At this step, it may choose not to go forward with some alternatives proposed by its members or other stakeholders.  Practicality demands this step; an agency cannot be expected to conduct a comprehensive analysis of every conceivable variation to its proposed action.  The governing regulations thus permit summary rejections, provided the agency "briefly discuss[es] the reasons for their having been eliminated."  40 C.F.R. § 1502.14(a).  Second, once it has delineated the universe of alternatives, the agency performs the comparative analysis that lies at the "heart" of the EIS of those remaining alternatives.  Id. § 1502.14.  The alternatives the agency opts not to implement are thus also rejected, although in a slightly different sense.  In this challenge, Plaintiff takes issue with the Council's decision to abandon alternatives at the first

stage.  Said otherwise, CLF thinks that various alternatives should have made it to the in-depth review process.

To evaluate this claim, the Court starts with the facts.  In the Western Gulf of Maine, the Council opted against comprehensively analyzing the impacts of several potential habitat-management areas proposed by one of its teams.  See EFH 4424; Pl. Mot. at 21–22, 41; Pl. Opp. & Reply at 20–21.  It provided several reasons for this decision.  First, considerations about adverse economic impacts on fishing communities drove its rationale, including "extreme[] concern[] about the potential economic impacts" of a particular proposed closure.  See EFH 7265.  More generally, the Council noted that it "preferred to work with refinements to areas already managed, as opposed to additional areas."  EFH 7264.

There can be little doubt that these are valid reasons for rejecting alternatives.  CLF, it should be noted, does not contend that anything about the nature of the Council's rationale is inherently inadequate.  It concedes, in fact, that "any one of these reasons might have supported the elimination of some of [the] alternatives," Pl. Mot. at 41, and may "ultimately have been meritorious."  Pl. Opp. & Reply at 21.  Its primary point, rather, is that NEPA bound the Council to provide an in-depth comparative analysis of each one, rather than rejecting these particular alternatives prior to that process.

The Court disagrees.  As a general matter, it would be untenable for the Council to have to consider every alternative in the broad Gulf that could have some possible positive impact on habitat.  The number of permutations is colossal. As the Supreme Court put it, agency's choices "cannot be found wanting simply because [it] failed to include every device and thought conceivable."  Vermont Yankee, 435 U.S. at 551.  The alternatives the Agency chose to comprehensively analyze fall within the numerous "judgment calls" and "line-drawing

decisions" that "are vested with the agencies, not the courts." <u>Coal. on Sensible Transp., Inc. v. Dole</u>, 826 F.2d 60, 66 (D.C. Cir. 1987). By providing a "brief[]" explanation of its rationale, the Council satisfied its responsibilities under NEPA. <u>See</u> 40 C.F.R. § 1502.14(a).

Moving to the grounds offered by the Council, the Court similarly finds them to be valid reasons to reject an alternative prior to conducting a comprehensive review. The Agency's goals and objectives, mimicking the statutory command, limit conservation measures to those "practicable" and "appropriate." EFH 7851. It is thus "reasonable for the agency to conclude" that alternatives with certain economic impacts would not "bring about the ends of the federal action." <u>City of Alexandria</u>, 198 F.3d at 867 (citation omitted). That is not to say, however, that it would be reasonable to reject out of hand every alternative that might have adverse consequences. But that is plainly not what happened here. Some of the alternatives the Council chose for detailed analysis themselves had the potential for adverse economic impacts; many were ultimately rejected on these grounds. <u>See, e.g.</u>, EFH 6392 (noting adverse economic impacts of potential Bigelow Bight closure).

The same is true for the Council's preference "to work with refinements to areas already managed." EFH 7264. Had it <u>only</u> considered refinements, rather than evaluating any new protection, the Court might view such a limited universe of alternatives with considerable skepticism. But again, that is not what the Council did. In all sub-regions, it performed a detailed alternatives analysis for areas that included new habitat-management areas. In this situation, the Court finds it perfectly reasonable to consider a preference for refining current areas. The myriad "line-drawing decisions" and "endless series of judgment calls" inherent these actions are left to the agency. <u>See</u> <u>Coal. on Sensible Transp., Inc.</u>, 826 F.2d at 66.

### c. Reasonableness of Range

Even if it was reasonable to reject particular alternatives, CLF still has a bone to pick with the ones that remain. In the Western Gulf of Maine, it says, the surviving alternatives are unreasonably skewed in one direction: no alternative analyzed increases the amount of habitat protected from fishing relative to the status quo. See Pl. Mot. at 41–42; Pl. Opp. & Reply at 21–23. As the Court will explain, this argument appears to rest on three premises. Because the Court ultimately disagrees with each one, it also finds Plaintiff's conclusion wanting.

First is CLF's assertion that the Service did not consider increases in EFH protection relative to the status quo. A factual nuance appears critical. As a careful reader will remember, the alternatives considered — with the exception of the "no action" and no-closure alternatives — are combinations of various new and modified habitat-management measures. Consistent with Plaintiff's position, the alternative that covers the maximum square mileage in the Western Gulf of Maine is the "no action" alternative. See EFH 6244. That is not to say, however, that the Council considered no new habitat measures. It plainly did. In the Western Gulf, it considered a new management area in Bigelow Bight, an area that, had it been adopted with no other changes to the status quo, would have increased the square mileage of habitat protection by over 50%. See EFH 6244. When organized into formal alternatives, however, the Council combined this new addition with modifications to other existing management areas that, on net, decreased the square mileage protected. See EFH 6241, 6244. This factual distinction gives rise to the first premise underlying CLF's argument. Its assertion that the Service failed to analyze options that increase the geographic scope of habitat protection thus rests on the premise that this formal organization of options into alternatives is meaningful. For if it is not, then the Service clearly considered the impact of significantly expanding habitat protection.

Ultimately, the Court doubts that the formal organization of habitat measures into alternatives is all that significant under the particular facts of this case when compared to the substance of the management areas within each alternative. For one, the Council's analysis of each alternative was not necessarily holistic with respect to the full suite of measures. Rather, it analyzed the pros and cons of each individual management area included separately. And when the Council considered a management area in an alternative that had already been analyzed earlier, it merely directed readers to that earlier section. See, e.g., EFH 6260 ("The Large Bigelow Bight area is discussed above."). Only in the very end of each discussion did it qualitatively sum these impacts to develop a recommendation on the alternative as a whole. Further, if the Agency's options were limited to choosing or rejecting an alternative *in toto*, perhaps the formal permutation would have some significance. But this clearly was not the case. In no sub-region of the Gulf of Maine did the Council recommend adopting any particular formal alternative in full; in each area, it recommended combining options from each. Combining the "no action" alternative (Alternative 1) with the Large Bigelow Bight option in Alternative 3 was thus an available choice, which would have increased the geographic scope of habitat protection by over 50%. For this reason, the Court does not think it wholly accurate to say that the Agency's EIS does not consider options that increase the square mileage of EFH protection relative to the status quo in the Western Gulf of Maine.

In that last sentence lies CLF's second premise: that the appropriate baseline of comparison is the status quo. Said another way, Plaintiff's worry that the Service has confined itself to "one end of the spectrum of possibilities," see Oceana, 384 F. Supp. 2d at 240, depends on where the midpoint of that spectrum lies. The Court does not share CLF's confidence that the status quo must be that midpoint. The Council's central purpose in undertaking this amendment

process, as everyone here agrees, was to ensure that the management measures in its jurisdiction minimized, to the extent practicable, the adverse effects of fishing on habitat. See 76 Fed. Reg. at 35408; Pl. Mot. at 2; Def. Opp. & Mot. at 4–5. Any reasonable range of alternatives therefore must clearly include differing levels of EFH protection. It is not at all clear, however, why the presence of pre-existing management areas in a particular sub-region would constitute the new midpoint. Analyzing the Service's decision under the "rule of reason," as it must, the Court finds it reasonable for the Agency to conclude that the goals of its action did not require it to so shift the consideration of the alternatives. See Theodore Roosevelt Conservation P'ship, 661 F.3d at 73.

Third and finally, CLF asserts that the reasonable range of alternatives should be defined in terms of geographic size of protected habitat. The Court believes this to be unduly constraining. As the record indicates, the geographic extent of an area, although an important factor, is not the sole driver in the level of habitat protection. While the "size of a particular management area is [a] contributing factor in terms of the positive benefits it may provide," larger areas may also "contribute to more displacement of fishing effort," thus negatively affecting other habitat outside of the protected region. See EFH 6201. The magnitude of protection also depends heavily on the underlying vulnerability of the area to impact from fishing gears. Id. Similarly, providing for additional restrictions on gear usage would also increase the amount of protection irrespective of the size of the geographic area. For these reasons, this Court agrees with other courts in this district that the "range of alternatives as defined in terms of EFH protectiveness [] encompass[es] much more than the simple percentage of closed areas." Oceana, 384 F. Supp. 2d at 240 (quoting Oceana, 2005 WL 555416, at *34).

In the end, the decisions that CLF challenges entail the type of line-drawing exercises properly entrusted to the Agency's discretion. The Court sees nothing unreasonable in the Council's analyses of alternatives. That dooms Plaintiff's claim here.

### d. "Rubber Stamp" Argument

Before moving on, one other issue merits a brief discussion. Peppered through Plaintiff's brief are suggestions that the Court should fault the Service for not having performed its own NEPA analysis apart from that conducted by the Council. It criticizes the Agency for having "rubber stamped" the Council's analysis and for not having offered any rationale "beyond that proffered by the committee itself." Pl. Opp. & Reply at 20; Pl. Mot. at 39. To the degree CLF intends these assaults as a stand-alone challenge to the Service's action, they fail thrice over. First, the Complaint makes no mention of any such claim and, in fact, seems to present a diametrically opposed position to CLF's view as expressed in its brief. See Am. Compl., ¶¶ 107–29. The former document states that "the fishery management council undertakes and prepares the NEPA decisional documents for NMFS," while "NMFS is solely responsible for ensuring that the NEPA analysis satisfies all legal requirements." Id., ¶ 111.

Second, this contention is factually dubious. CLF's assertion that the Service bought the Council's recommendations hook, line, and sinker without analysis is contradicted by the record. As the Government points out, the Service was involved in much of the Council's process and aided in preparing the EIS, which includes the detailed NEPA alternatives analysis. See, e.g., EFH 6158; Def. Reply at 17–18.

Finally, these positions come up short on the merits. The Service's duty is to ensure that the Council's action complies with applicable law. Councils, rather, "are the primary bodies charged with developing FMPs in the first instance, a process that generally involves years of

research [and] the weighing of various alternatives." Oceana, 2005 WL 555416, at *2. The Service's options are limited to approving, disapproving, or partially approving a proposed fishery-management plan based only on consistency with applicable law. See 16 U.S.C. § 1854(a)(3). Nothing requires the Agency to duplicate or supplement the Council's work. In fact, should such a deficiency exist, the remedy is for the Service to send the matter back to the Council, rather than substitute its own judgment. NEPA's "rule of reason" permits an Agency to depend on another body's rejection of alternatives: "Agencies need not reanalyze alternatives previously rejected" by another body. See Friends of Capital Crescent Trail v. Fed. Transit Admin., 877 F.3d 1051, 1063 (D.C. Cir. 2017).

3. *Corals Amendment*

The Court's last port of call requires it to evaluate the Agency's decision to consider in a separate amendment protective measures designed to protect corals, a decision to which Plaintiff now takes exception.

Backing up to first principles, the primary goal of the Habitat Amendment was to minimize the adverse effect of fishing on habitat essential to the various species of fish managed by the Council, consistent with § 1853(a)(7)'s command in the MSA. See 76 Fed. Reg. at 35408–09; Pl. Mot. at 2; Def. Opp. & Mot. at 4–5. Habitat under this section therefore warrants protection only to the degree it is essential to a species of fish. Should ocean corals fall within such habitat, then they may warrant protection under this provision. In 2007, Congress amended the MSA to provide discretionary authority to the Secretary to also provide measures to protect deep-sea corals in their own right, and not only if essential to certain fish species. See Pub. L. 109-479, Title I, §§ 105, 211 (codified at 16 U.S.C. §§ 1853(b)(2), 1884); see also 16 U.S.C. § 1853(b)(2)(B) (permitting Service to "protect deep sea corals from physical damage from

fishing gear"). Following this statutory revision, the Council opted to include within the Habitat Amendment's purview efforts to mitigate the fishing impacts on deep-sea corals under this new authority. See EFH 7861. It did so "as a matter of convenience," as both EFH protection measures and deep-sea-coral protection measures were "habitat-related action[s]." 77 Fed. Reg. 44214, 44215 (July 27, 2012). Consistent with this goal, it developed a range of alternatives to study in detail. Id. In 2012, however, the Council changed course. Concerned that the corals measures required further scientific study and information not yet available, it sought to segment off deep-sea-coral protections into a separate action, called the Deep-Seal Coral Amendment. See 83 Fed. Reg. at 15245. It thus published a notice of its proposed action in the Federal Register, inviting comments. See 77 Fed. Reg. at 44215 ("The purpose of this notification is to alert and seek comment from the public about Council's consideration of splitting the deep-sea coral discretionary provision alternatives from OA2, and including them in a separate omnibus amendment."). Despite being active commenters on other Service proposals, CLF remained silent on this one. See Pl. Opp. & Reply at 23; Def. Opp. & Mot. at 38. After receiving minimal and mostly positive feedback, the Council split off the deep-sea-coral amendments to a new amendment. See Def. Opp. & Mot. at 38.

CLF now objects. In short, it complains that the Service did not conduct an analysis of various proposed alternatives to protect deep-sea corals in the Habitat Amendment. It takes issue with the fact that "[t]here is no NEPA analysis of any alternatives minimizing the impacts of fishing gears on corals EFH in the Gulf of Maine." Pl. Mot. at 23. By not analyzing alternatives, CLF says that the Agency failed to take a "hard look" at the "environmental impacts of this decision." Id. at 44.

Before jumping into these claims, the Court clarifies a few factual issues that pervade the parties' briefs in the hope that doing so will streamline the subsequent discussion.  As of 2012, the Habitat Amendment consisted of, among other things, two separate categories of measures. The first was to develop "alternatives to minimize, to the extent practicable, the adverse effects of Council-managed fisheries on EFH."  77 Fed. Reg. at 44214–15.  This goal has been the focus of much of this Opinion.  Second, it sought to develop "alternatives to minimize fishing effects on deep-sea corals developed under [the MSA's] . . . discretionary provisions."  Id.  It is only this latter category that was segmented into a separate amendment.  Id.  Contrary to what Plaintiff's briefs imply, if not explicitly state, the Council did not segment off all habitat that happens to be corals from consideration or inclusion in measures addressed in the Habitat Amendment.  The SASI model and groundfish data used to determine the hotspots that, in turn, produced potential habitat-management areas considered the vulnerability of all habitat essential to fish; they did not exclude corals.  In fact, the record demonstrates that some of these potential habitat-management areas included corals within their ambit.  See, e.g., EFH 6219 ("The Large Eastern Maine HMA extends further offshore, and encompasses steep, rocky habitats colonized by deep-sea corals surrounding Mt. Desert Rock.").  It is only potential measures intended to protect corals directly that the Council separated.  See 77 Fed. Reg. at 44215.  With that slight detour out of the way, the Court returns to Plaintiff's worries.

CLF's challenge comes in two flavors.  First, it contends that NEPA requires that the Council present in the current Habitat Amendment FEIS a comparative analysis of measures to protect deep-sea corals.  See Pl. Mot. at 23, 44; Pl. Opp. & Reply at 24.  NEPA does not so require.  That statute only "requires an agency to evaluate the environmental effects of its action at the point of commitment."  Found. on Econ. Trends v. Heckler, 756 F.2d 143, 158 (D.C. Cir.

1985) (emphasis added) (citation omitted); see also Mashack v. Jewell, 149 F. Supp. 3d 11, 28

(D.D.C. 2016) ("NEPA applies only to agency actions, even if inaction has environmental

consequences.") (internal citations omitted). This moment occurs when the Agency "irrevocably

commit[s]" itself. See Found. on Econ. Trends, 756 F.2d at 158. A "decision deferred" plainly

does not qualify. Id. (citation omitted). That, of course, is precisely what happened here. Rather

than decide on management measures to protect deep-sea corals now, the Agency put off this

decision to a separate process. Only the completion of that process could trigger the need for an

alternatives analysis under NEPA. Indeed, the Government promises a NEPA analysis at that

point. See Def. Opp. & Mot. at 39.

Two arguments related to this first contention and arguably advanced by Plaintiff here

gain no ground. To begin, while the Agency may not be able to defer the consideration of a

specific alternative to the proposed action, see Flaherty v. Bryson, 850 F. Supp. 2d 38, 72

(D.D.C. 2012); Pl. Mot. at 44, that is not what occurred here. The deferred deep-sea-coral

alternatives serve a statutory goal distinct from EFH protection measures; the two categories are

not substitutes for one another such that deep-sea corals constitute "alternatives to the proposed

action" adopted by the Service. See 42 U.S.C. § 4332(C)(iii). And to the extent Plaintiff argues

that NEPA requires the Service to provide a specific analysis for corals that also constitute

habitat essential fish, see Pl. Opp. & Reply at 25, the Court is at a loss to find any law or logic to

support this proposition. Corals, to the degree they also constitute EFH, were considered within

the Council's alternatives already analyzed. That is enough.

CLF also hints that the deep-sea-corals measures and EFH measures are connected

actions for which NEPA requires joint consideration. See Pl. Mot. at 43. It is true that, under the

anti-segmentation rule, certain "connected" actions require a comprehensive environmental

analysis.  See Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers, 301 F. Supp. 3d 50, 67 (D.D.C. 2018).  NEPA thus provides that an agency acts unlawfully when it "divides connected, cumulative, or similar federal actions into separate projects and thereby fails to address the true scope and impact of the activities that should be under consideration."  Del. Riverkeeper Network v. FERC, 753 F.3d 1304, 1313 (D.C. Cir. 2014).  Following 40 C.F.R. § 1508.25(a)(1), connected actions are those that "(i) Automatically trigger other actions which may require" an EIS; "(ii) Cannot or will not proceed unless other actions are taken previously or simultaneously"; or "(iii) Are interdependent parts of a larger action and depend on the larger action for their justification."

Plaintiff's argument on this count is only a hint, however, because it never meaningfully engages with these prongs or otherwise explains why the two categories of actions are connected.  The explanation perhaps is that they are not.  The Service's analysis identified minimal overlap between them.  See 77 Fed. Reg. at 44215–16.  Nor is there any contention that they relate to some larger act for justification, automatically trigger other actions, or need to proceed simultaneously.  The Agency, therefore, was within its rights to segment off the consideration of deep-sea corals into a separate amendment.

*       *       *

NEPA, as it turns out, proves no more fruitful a ground for Plaintiff than the MSA.  The record reveals that the Agency's path to its ultimate decision meets the procedural requirements imposed by this statute.  With that, this voyage comes to an end.

## IV.    Conclusion

The Court will, accordingly, deny Plaintiff's Motion for Summary Judgment and grant

Defendants' Cross-Motion for Summary Judgment.  A separate Order so stating will issue this

day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  April 15, 2019